**Feldesman Leifer LLP**
Edward T. Waters (D.C. Bar No. 422461)
ewaters@feldesman.com
Mindy B. Pava (D.C. Bar No. 995328)
mpava@feldesman.com
Stephen Kuperberg (D.C. Bar No. 462992)
skuperberg@feldesman.com
1129 20th Street NW, 4th Floor
Washington, DC 20036
(*t*) (202) 466-8960
*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **CATHOLIC CHARITIES, DIOCESE OF FORT WORTH, INC., d/b/a CATHOLIC CHARITIES FORT WORTH, 249 Thornhill Dr., Fort Worth, Texas 76115** | |
| *Plaintiff,* | Civil No. _____ |
| **v.** | |
| **U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES (DHHS), 200 Independence Avenue, S.W. Washington, D.C. 20201,** | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| **and** | |
| **ROBERT F. KENNEDY, JR., SECRETARY OF DHHS, IN HIS OFFICIAL CAPACITY ONLY, 200 Independence Avenue, S.W. Washington, D.C. 20201** | |
| *Defendants.* | |

1

Plaintiff Catholic Charities, Diocese of Fort Worth, Inc. ("CCFW"), hereby brings this action against Defendants United States Department of Health and Human Services ("HHS") and Robert F. Kennedy, Jr., in his official capacity as Secretary of HHS (collectively, "HHS," or "Defendants") to un-freeze federal grant funding that is obligated to CCFW by law—and essential to the services that Congress has mandated for new arrivals to the United States who are fleeing persecution in their home countries.

As the Replacement Designee for the state of Texas for Defendant HHS's Office of Refugee Resettlement ("ORR"), CCFW provides coordination, compliance guidance, and data support, as well as direct support services, to over 100,000 federally-documented and lawfully-admitted individuals and families through the Congressionally-mandated and appropriated Refugee Resettlement Program ("RRP"). The RRP provides assistance to refugees and other admitted immigrants with documented legal status, primarily from countries such as Cuba, Afghanistan, and Ukraine, for whom the United States government has specifically granted entry (and whom collectively the ORR terms "refugees" for purposes of its services).

For nearly fifty years, CCFW has faithfully provided essential services to these documented and lawfully-admitted individuals pursuant to Congressional mandates and appropriations; moreover, since October 2021, CCFW has served as ORR's Replacement Designee (RD) for the state of Texas, responsible for coordinating the RRP across the state and partnering with a state network of contractors and sub-recipients.

Shortly after the new Administration took office in January 2025, Defendants attempted to unlawfully freeze federal grant funds across the federal government's operations, including grant funds obligated to CCFW under four open federal grant awards, most visibly via OMB Memorandum M-25-13. While the government later rescinded that attempt, and many entities have received their

federal funding in the weeks since the attempted funding freeze, CCFW has not been able to draw down any funds—and has not received any indication why its funds remain frozen.

Despite four attempts by CCFW on January 29 and 30 to obtain payment of obligated grant funds through Defendants' Payment Management Services system ("PMS"), and another ten requests in the following four weeks, Defendants have persisted in unlawfully preventing CCFW from obtaining over $36 million under its open grant agreements—an amount owing that continues to mount with the services CCFW continues to provide, unfunded, with each passing day.

As this Court is aware, CCFW has been far from alone in confronting Defendants' unlawful attempt to pause all federal grant funding. On February 25, 2025, the Honorable Judge Loren L. AliKhan of this Court ordered that the Administration was preliminarily "enjoined from implementing, giving effect to, or reinstating under a different name the unilateral, non-individualized directives in OMB Memorandum M-25-13 with respect to the disbursement of Federal funds under all open awards" and that agencies may not take any steps to implement the federal funding freeze as contemplated by OMB Memorandum M-25-13. *National Council of Nonprofits v. OMB*, Civil Action No. 25-239, Dkt. No. #52 (Feb. 25, 2025) (issuing a preliminary injunction to block the government's efforts to freeze federal funding).

Defendants' unlawful behavior, in defiance of the Constitutional authority of Articles I and III co-equal branches of government, results in real-world harm not only to CCFW but also to the more than 100,000 individuals and families to whom CCFW and its partner agencies provide essential, Congressionally-mandated services. In CCFW's case, as CCFW wrote to ORR on February 17, "the lack of payments has resulted in 24 of our 29 partner agencies experiencing staff layoff or furloughs," resulting in the over 100,000 eligible individuals and families "losing access to critical services." Neither CCFW, nor its large network of contractors and sub-recipients, have the ability to

3

cover the cash flow necessary to continue operating to serve Congress's intent without receiving the Congressionally-appropriated funding for those services. Thus, CCFW's partners have had to lay off staff, close offices, and cut certain supportive services programs as a result of the lack of payments, resulting in a frustration of CCFW's mission and Congressional mandate.

Accordingly, CCFW requests that this Court enjoin—temporarily, preliminarily, and permanently—Defendants' refusal to provide CCFW with funding under its open grant awards through the Refugee Resettlement Program. CCFW also asks that this Court declare that Defendant HHS's funding freeze for the Refugee Resettlement Program, as applied to CCFW, is arbitrary and capricious under the Administrative Procedure Act ("APA").

## **INTRODUCTION**

1. Catholic Charities, Diocese of Fort Worth, Inc. ("CCFW"), brings this action because although it has submitted fourteen (14) drawdown requests for funding via the Payment Management Services ("PMS") system since January 29, 2025, totaling more than $36 million, it has not received one dollar of those requests. The consequences of this pause on federal funding have been devastating for CCFW and the 100,000 individuals and families that it supports.

2. As the many orders and memorandum opinions in *National Council of Nonprofits v. OMB* describe, on January 27, 2025, the Office of Management and Budget (OMB) issued Memorandum M-25-13, which stated, in part, that all federal agencies "must temporarily pause all activities related to obligation or disbursement of all Federal financial assistance." The memorandum led to widespread confusion among all federal grantees and contractors and caused organizations to rush to draw down funds from PMS.

3. Less than two days later, OMB issued Memorandum M-25-14, which purported to rescind the previous memorandum; however, as *National Council of Nonprofits v. OMB* also

describes, the White House Press Secretary made clear on X (formerly Twitter) that the Administration's purported rescission was merely a pretext to substitute alternative justifications to evade court injunctions to stop the funding freeze. That week, both the District Court for the District of Rhode Island and this Court issued Temporary Restraining Orders that required agencies not to freeze funding.

4.     As many other federal grantees did, CCFW submitted several requests for payment during this period, as CCFW has four open and ongoing federal grant awards with HHS. On January 29 and 30, 2025, CCFW submitted four requests to draw down a total of $25.4 million. These requests, which are generally paid out by PMS within one or two days of the request, are still listed as "request in transit" more than four weeks after the initial requests were made; and, while Defendants have released other pending grant payments, Defendants have not released CCFW's funds.

5.     CCFW has made ten additional drawdown requests since January 30, totaling another $10.6 million in requested funds. As of this filing, these subsequent requests also remain listed as "request in transit."

6.     Despite CCFW's repeated requests for an explanation why HHS has paused its funding—even though the subsequent OMB memorandum, M-25-14, facially purported to rescind the nationwide funding pause and at least two court orders required the Defendants to unfreeze obligated funding—HHS has not provided any response, much less a lawful rationale, why CCFW's funding remains frozen.

7.     As a direct result of this chaos, CCFW has accumulated $36 million in pending, unpaid reimbursements for services already rendered to eligible individuals across Texas and is accruing millions more each week—with no indication that any Defendants will honor either past or future

5

requests for release of funds. As discussed below, full funding is necessary to avoid significant and irreparable harms to CCFW as well as its partners and the eligible RRP beneficiaries. These harms include furloughing staff and shutting down refugee resettlement operations, to say nothing of the inability to pay for rent and the array of services provided to eligible individuals for whom Congress mandated assistance.

8.    CCFW also faces irreparable damage to its reputation, to its ability to work with the community, and to its relationship with its subrecipients and with the federally-documented and lawfully-admitted individuals and families it serves. CCFW's inability to reimburse its partner organizations, in turn, has required some of those organizations to lay off staff and may require them to stop providing aid for resettlement support to these individuals and families, ultimately damaging and preventing CCFW from accomplishing its nonprofit mission.

9.    Defendants' funding pause contravenes appropriations-related statutes and flouts the Article I Constitutional allocation of the power of the purse to Congress. Congress has appropriated specific sums of money for refugee assistance and resettlement to remain available until expended, and it has mandated that the government provide prompt and adequate funding for the initial resettlement of populations that the government has admitted and deemed eligible for services from agencies like CCFW. *See* 8 U.S.C. § 1522(a). Given the continuing availability of appropriations, the Executive Branch cannot unilaterally and indefinitely refuse to fund those statutorily-mandated services. *See Train v. City of New York*, 420 U.S. 35, 41–44 (1975).

10.    By ignoring Congressional appropriations, moreover, the freeze on CCFW's funding violates the Constitution's Spending Clause, which provides that Congress, not the Executive Branch, decides how public funds shall be spent.

11.    In addition, the Impoundment Control Act sets forth specific procedural and substantive requirements for Executive Branch attempts to delay spending of appropriated funds—requirements that Defendants have not satisfied for CCFW or indeed for any federal grantee. 2 U.S.C. § 684. The payment freeze on CCFW therefore exceeds the government's statutory authority.

12.    Moreover, the funding pause, as directed to CCFW, is arbitrary and capricious under the Administrative Procedure Act, 5 U.S.C. §§ 701-706.  Defendants have offered no explanation, rational or otherwise, for freezing funding to CCFW for time-sensitive, urgent, and essential services CCFW provides to government-approved RRP beneficiaries, including individuals the government has already deemed eligible and are receiving services from CCFW and its subrecipients.  Defendants have failed to address the obvious and devastating consequences that a sudden and indefinite funding freeze would impose on CCFW, its subrecipients, and individual RRP beneficiaries. The net effect of Defendant's unconsidered action is to halt progress toward the Congressionally-mandated mission to use Congressional appropriations to the maximum extent available to allow beneficiaries to achieve self-sufficiency "as quickly as possible." *See* 8 U.S.C. § 1522(a)(1)(A).

13.    To be clear: no other lawful action by the Defendants justifies their continued freeze of CCFW's payments, either. Although the Trump Administration has issued Executive Orders limiting immigration, those Executive Orders do not apply to CCFW's programs, which provide domestic assistance and support services to specified categories of documented, previously-admitted individuals located in the United States. 8 U.S.C. § 1522(a)(3); see also 45 C.F.R. § 400.43(a) ("An applicant for assistance under [the Refugee Act] must provide proof, in the form of documentation issued by the Immigration and Naturalization Service (INS), of one of the following statuses under the Act as a condition of eligibility"). CCFW has not received any notifications asserting that new

7

policy priorities have changed the government's ability to fund CCFW's existing grants—nor could they, given the express Congressional mandates and specific Congressional appropriations.

14. In sum, Defendants' freeze of funding that CCFW (and its partners) spends on refugee resettlement services under its grant awards with HHS is unlawful. This Court should declare Defendants' actions unlawful, set them aside, and order Defendants to unfreeze reimbursements pursuant to the grant awards, so that CCFW's vital work supporting lawfully-admitted individuals and families may continue.

CCFW specifically alleges as follows:

## JURISDICTION AND VENUE

15. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331. Judicial review of HHS' actions is authorized under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

16. Sovereign immunity has been waived under 5 U.S.C. § 702.

17. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1)(A). HHS is headquartered in Washington, D.C., and Secretary Kennedy maintains his principal office in Washington, D.C. On information and belief, Defendants' decisions regarding CCFW's drawdown requests, as submitted via PMS, have been made in the District of Columbia. 28 U.S.C. § 1391(e)(1)(B).

## PARTIES

18. Catholic Charities, Diocese of Fort Worth, Inc. ("CCFW"), is a nonprofit charitable agency located in Fort Worth, Texas. CCFW's core mission is to provide service to those in need, to advocate compassion and justice in the structures of society, and to call all people of good will to do the same. Through the Congressionally-mandated Refugee Resettlement Program ("RRP"), CCFW

8

provides resettlement support services to government-approved, legally admitted, refugees and other individuals falling under specified categories originating from counties such as Afghanistan, Cuba, Ukraine, and others.

19.    Defendant U.S. Department of Health and Human Services ("HHS") is an agency of the government of the United States within the meaning of 5 U.S.C. § 701(b)(1). Congress established the position of Director and Office of Refugee Resettlement ("ORR") within HHS to take care that Congressional mandates regarding the Refugee Resettlement Program ("RRP") be faithfully executed and disburse funds Congress appropriated for RRP. Among other things, Defendant HHS has the responsibility to process and pay RRP grant funds to CCFW pursuant to the terms of the grant awards.

20.    Defendant Robert F. Kennedy, Jr. is the Secretary of HHS. Secretary Kennedy is sued in his official capacity.

## LEGAL BACKGROUND ON THE REFUGEE RESETTLEMENT PROGRAM

### A.  STATUTORY BACKGROUND

21.    As Defendant HHS's website describes, the United States Congress has authorized and appropriated funds for the resettlement of refugees since the conclusion of World War II "reflecting our core values and our tradition of being a safe haven for the oppressed." HHS Office of the Administration for Children & Families, Office of Refugee Resettlement, "History," available at https://acf.gov/orr/about/history (accessed on February 23, 2025).

22.    Defendant HHS's website continues: "The Refugee Act of 1980 created The Federal Refugee Resettlement Program to provide for the effective resettlement of refugees and to assist them to achieve economic self-sufficiency as quickly as possible after arrival in the United States." *Id.*, "The Refugee Act," available at https://acf.gov/orr/policy-guidance/refugee-act (accessed on February 23, 2025).

9

23.    Indeed, as Congress stated in its Declaration of Policies and Objectives for title IV of the Immigration and Nationality Act, also known as the Refugee Act of 1980, Pub. L. 96-212, title I, § 101, 94 Stat. 102 (Mar. 17, 1980):

    a.   it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands, including, where appropriate, humanitarian assistance for their care and maintenance in asylum areas, efforts to promote opportunities for resettlement or voluntary repatriation, aid for necessary transportation and processing, admission to this country of refugees of special humanitarian concern to the United States, and transitional assistance to refugees in the United States….

    b.   The objectives of this Act are to provide a permanent and systematic procedure for the admission to this country of refugees of special humanitarian concern to the United States, and to provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are admitted.

24.    To accomplish its objectives, Congress created the Office of Refugee Resettlement ("ORR") within Defendant HHS "to fund and administer" refugee resettlement program services. 8 U.S.C. § 1521.

25.    The statute directs that "the Director *shall, to the extent of available appropriations*," make available resources for refugees to achieve Congress's stated resettlement objectives "*as quickly as possible*," including, among others: employment training and placement; English language training; and cash assistance. *See* 8 U.S.C. § 1522(a)(1)(A) (emphasis added). The statute authorizes the Secretary of HHS to issue regulations to carry out these and other objectives through the making of grants to and contracts with public or private nonprofit agencies. 8 U.S.C. § 1522(a)(9); *see generally* 8 U.S.C. § 1522(b)-(e).

26.    The statute also specifies that the Director shall "insure that women have the same opportunities as men to participate in training and instruction," 8 U.S.C. § 1522(a)(1)(A), and that "[a]ssistance and services funded under this section shall be provided to refugees without regard to race, religion, nationality, sex, or political opinion," 8 U.S.C. § 1522(a)(5). The statute further

requires the submission of state plans to the Director providing a description of how the state coordinator will ensure compliance with the Congressionally mandated statutory requirements. 8 U.S.C. § 1522(a)(6).

27.    ORR's RRP program operates in coordination with the State Department, which provides initial, short-term assistance for the admission of refugees, while ORR implements grants to provide longer-term assistance in host communities within the United States following admission. *See id.* Although certain individuals travel to the United States on their own and apply through the Department of Homeland Security for asylum, such individuals (with the statutory exceptions for certain Cuban and Haitian immigrants described below) qualify for assistance through ORR only after an authorized federal government entity grants their asylum application, not while their application is pending. *See generally* ORR, "Fact Sheets: Eligibility & Benefits," available at https://acf.gov/orr/programs/refugees/factsheets (accessed Feb. 28, 2025). In other words, even in the case of asylees, individuals labeled under ORR's generalized terminology as "refugees" each first obtain documented, legal immigration or parolee status within the United States from the federal government before qualifying for RRP refugee resettlement benefits.

28.    Congress has from time to time expanded the scope of the services provided under ORR, so that the categories of individuals eligible to receive ORR benefits now include seven additional distinct groups, as reflected on ORR's website, https://acf.gov/orr/about/what-we-do:

  a. In 1980 and 1981, Congress expanded refugee resettlement services to include individuals with an immigration status of Cuban-Haitian entrant (status pending) for a 36-month period after acquiring that status. *See* 8 U.S.C. § 1522 note; *see also* Pub. L. 96-422, 94 Stat. 1799, 1810 (Oct. 10, 1980); Pub. L. 97-35, 95 Stat. 357, 463 (Aug. 13, 1981).

b.  In 1988, Congress expanded refugee resettlement services to include certain immigrants from Vietnam. *See* 8 U.S.C. § 1101 note.

c.  In 1998, Congress expanded refugee resettlement services to include specified torture survivors. *See* 22 U.S.C. § 2152 note; Torture Victims Relief Act of 1998, Pub. L. 105-320, 112 Stat. 3016, 3017-18 (Oct. 30, 1998).

d.  In 2000 and 2008, Congress expanded refugee resettlement services to include adult and child victims of human trafficking. *See* 8 U.S.C. § 1232(d)(4)(A); William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Section 235, Pub. L. 110-457, 122 Stat. 5044, 5080 (Dec. 23, 2008); 22 U.S.C. § 7105(b)(1)(A); Victims of Trafficking and Violence Protection Act of 2000, Section 107, Pub. L. 106-386, 114 Stat. 1464, 1475 (Oct. 28, 2000).

e.  In 2008 and subsequent years, Congress expanded refugee resettlement services to include certain immigrants from Iraq. *See* 8 U.S.C. § 1157 note.

f.  In 2009 and 2021, Congress expanded refugee resettlement services to include certain immigrants from Afghanistan. *See* 8 U.S.C. § 1101 note; Extending Government Funding and Delivering Emergency Assistance Act, Pub. L. 117-43, div. C., title V, § 2502, 135 Stat. 344, 377 (Sep. 30, 2021); Afghan Allies Protection Act (part of the Omnibus Appropriations Act, 2009), Pub. L. 111-8, Section 602, 123 Stat. 524, 809 (Mar. 11, 2009).

g.  In 2022, Congress expanded refugee resettlement services to include certain immigrants from Ukraine. *See* 8 U.S.C. § 1101 note; Additional Ukraine Supplemental Appropriations Act, 2022, Pub. L. 117-128, 136 Stat. 1211, 1218 (May 21, 2022).

29.     More recently, Congress appropriated over $6.3 billion in funds for the continued operation of ORR's refugee resettlement activities under this statute and others, to be available through September 30, 2025, in the Consolidated Appropriations Act of 2023. Pub. L. 117-328, 136 Stat 4459, 4870-71 (Dec. 29, 2022).

30.     Additionally, Congress has frequently appropriated additional funds for ORR's refugee resettlement programs, particularly to aid the resettlement of lawfully-admitted individuals from Afghanistan and Ukraine. For example, Congress appropriated $2.5 billion in funds for the continued operation of ORR's refugee resettlement activities under the Refugee Act and others, to be available through September 30, 2024, in Sections 141 and 142 of Pub. L. 117-43, 135 Stat. 344, 353 (Sep. 30, 2021). In that same law, in a section identified as the Afghanistan Supplemental Appropriations Act, 2022, Congress appropriated an additional $1.68 billion in funds to remain available until September 30, 2023 for refugee and entrant assistance activities in support of Afghan nationals admitted as refugees. *Id.* at 374.[1]

31.     Similarly, Congress appropriated $900 million, to be available through September 30, 2023, for refugee and entrant assistance in support of nationals of Ukraine. *See* Additional Ukraine Supplemental Appropriations Act, 2022, Pub. L. 117-128, 136 Stat. 1211, 1217 (May 21, 2022).

32.     Congress enacted these and other appropriations to fund the grants and services necessary to effectuate its purpose under the Refugee Act and related provisions. At the time that ORR awarded CCFW the grants at issue in this matter and continuing to the date of this filing, Congress has appropriated to funding for ORR to meet its payment disbursement obligations under

---

[1] *See also* Pub. L. 117-70, 135 Stat. 1499, 1500 (Dec. 3, 2021) (same; Afghan refugee appropriation in amount of $1,263,728,000 available through Sep. 30, 2023); Pub. L. 117-180, 136 Stat. 2114, 2123 (Sep. 30, 2022) (same; Afghan refugee appropriation in amount of $1,775,000,000 available through Sep. 30, 2025).

those grants. Defendant HHS included citations to many of the appropriations above in its grant awards to CCFW.

## B. REGULATORY BACKGROUND

33.    The Office of Refugee Resettlement's implementing regulations for the Refugee Act as authorized by Congress appear at 45 C.F.R. Chapter IV, Parts 400, 401, 402, 410, and 411. *See also* 8 U.S.C. § 1522(a)(9) (providing for regulatory authority).

34. Under ORR regulations for grants to states for refugee resettlement, states or replacement designees ("RDs")—that is, entities that ORR designates if a state government is unwilling or unable to participate in the Refugee Resettlement Program—coordinate the RRP program for ORR in the respective state. 45 C.F.R. § 400.8.

35. Pursuant to 45 C.F.R. § 400.301, when a state government agency partially or fully withdraws from the administration of the Refugee Resettlement Program, ORR can designate one or more replacement designees (RDs) to administer the provision of assistance and services in that state.

36.    For decades, the U.S. federal government has partnered with refugee resettlement agencies to assist individuals and families—who are vetted by the federal government and admitted to the United States legally—as they attempt to set up new lives within the country.

37.    CCFW has been assisting with the resettlement of such individuals and families since the fall of Vietnam in 1975. For 50 years, CCFW has served those who have been forced to leave their homeland because of a well-founded fear of persecution based on race, religion, nationality, political opinion, or membership in a particular social group.

38.    The state of Texas announced its withdrawal from the ORR refugee resettlement program in 2016.  In early 2017, ORR first assigned four regional replacement designees. ORR designated CCFW as the Regional Replacement Designee for Texas Region 2 in north Texas on

14

January 31, 2017. *See* ORR, Dear Colleague Letter 17-03 (Mar. 3, 2017), available at https://acf.gov/orr/policy-guidance/texas-replacement-designees (accessed Feb. 28, 2025).

39.    Beginning in 2021, ORR offered competitive awards for the role of RD in each state. ORR selected CCFW as the Replacement Designee for the state of Texas, effective for Fiscal Year 2022 through Fiscal Year 2026, to administer Refugee Support Services ("RSS") and Refugee Cash and Medical Assistance ("RCMA") programs. ORR, Dear Colleague Letter 22-02, Replacement Designee Selections for Fiscal Year 2022 (Oct. 5, 2021), available at https://acf.gov/sites/default/files/documents/orr/ORR-DCL-22-02-FY2022-Replacement-Designee-Selections.pdf (accessed Feb. 28, 2025).

40.    In its role as RD for the state of Texas, CCFW operates the official Texas refugee resettlement services website, Texas Office for Refugees, and coordinates support for twenty-nine (29) partner agencies providing essential RRP services across the state. *See* Texas Office for Refugees, available at https://txofficeforrefugees.org/ (accessed Feb. 28, 2025).

41.    ORR regulations 45 C.F.R §§ 400.4 – 400.9 outline the process RDs like CCFW undertake to submit a state plan to ORR for approval in order to receive refugee resettlement assistance funds appropriated under section 414 of the Immigration and Nationality Act (that is, the Refugee Act).

42.    On January 14, 2025, Ken Tota, Bureau Chief of the Refugee Program Bureau within the Office of Refugee Resettlement, approved by letter the Texas State Plan for Fiscal Year 2025 that CCFW submitted to ORR as Texas RD. (*See* Exh. A, January 14, 2025 Letter from K. Tota to J. Audi; *see also* Exh. B, Texas Office for Refugees FY2025 Texas State Plan, OMB Control No. 0970-0351). The letter informed CCFW that ORR had approved the Texas FY 2025 State Plan and that ORR deemed the plan compliant with ORR's regulations per 45 C.F.R. Part 400; the Afghanistan

Supplemental Appropriations Act, 2022 and succeeding legislation; and the Additional Ukraine Supplemental Appropriations Act, 2022. The letter closed by stating: "[we] appreciate the work of your office to successfully resettle ORR-eligible clients in Texas, and we look forward to continuing our partnership."

## C. CCFW'S FOUR OPEN GRANT AWARDS

43.    Given the foregoing statutory and regulatory framework, CCFW operates under four open and ongoing federal grant awards from Defendant HHS that are the subject of this case. Two of those grants are for Refugee Support Services, and two are for Refugee Cash and Medical Assistance programs:

    a.    Refugee Support Services: Award #24ABTXRSSS-05 (budget period October 1, 2023 through September 30, 2025); in the amount of $58,370,768.00 (which, when added to $37,591,284.00 in federal funds otherwise obligated in the applicable budget period, totaled $95,962,052.00 in federal award);

    b.    Refugee Support Services: Award #25ABTXRSSS-00 (budget period October 1, 2024 through September 30, 2026); in the amount of $58,818,851.00;

    c.    Refugee Cash and Medical Assistance: Award # 2404TXRCMA-05 (budget period from October 1, 2023 to September 30, 2025); in the amount of $5,264,271.00 (which, when added to $273,619,806.00 in federal funds otherwise obligated in the applicable budget period, totaled $278,884,077.00 in federal award);

    d.    Refugee Cash and Medical Assistance: Award # 2504TXRCMA-00 (budget period from October 1, 2024 to September 30, 2026); in the amount of $25,666,162.00.

## FACTUAL BACKGROUND

### A.    CCFW'S SUPPORTIVE SERVICES TO REFUGEES

44.    As described above, national refugee resettlement organizations often partner with a wide network of local affiliates that help newly-arrived individuals and families enroll children in school, find housing and cover rent, find employment, and sign up for health insurance, among other tasks.

16

45.    Through the Texas Office for Refugees and partner agencies as Texas RD, as well as directly, CCFW currently supports more than 100,000 eligible individuals and families in Texas under the Refugee Support Services and Cash and Medical Assistance programs.

46.    Cash and Medical Assistance (CMA) consists of two sub-programs: Refugee Cash Assistance (RCA) and Refugee Medical Assistance (RMA).

    a.    The RCA program provides individuals and families from ORR-eligible populations, as authorized by Congress, who are ineligible for Temporary Assistance for Needy Families (TANF), up to twelve months of cash assistance and provides referrals to meet core needs while participants seek self-sufficiency.

    b.    The RMA program provides up to twelve months of medical coverage to ORR-eligible populations who are ineligible for Medicaid. The benefits mirror Medicaid in each state.

47.    Refugee Support Services (RSS) includes fourteen (14) sub-programs, including but not limited to English language instruction, job readiness and placement services, civics instruction to prepare for completion of the U.S. Citizenship and Immigration Service (USCIS) Naturalization Interview and Civics Test, pre-high school equivalency instruction to prepare for a standard General Educational Development (GED) course or to take the GED Exam, and vocational training.

48.    CCFW has provided the array of services under RRP to hundreds of thousands of refugee individuals and families for decades with excellence, as evidenced in part by ORR's continued confidence in CCFW to coordinate ORR's statewide refugee services as Replacement Designee for Texas since 2021 and as a regional Replacement Designee since 2017.

**B.     DEFENDANT'S UNLAWFUL ATTEMPT TO FREEZE GRANT FUNDS**

49.     On January 27, 2025, Matthew J. Vaeth, acting director of the Office of Management and Budget, issued a memorandum, M-25-13, titled "Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs." This memorandum was issued less than two weeks after CCFW received the letter from ORR described above approving CCFW's FY 2025 State Plan as the State of Texas RD.

50.     The OMB Memorandum stated, in part, that all federal agencies "must temporarily pause all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency actions that may be implicated by the executive orders, including, but not limited to, financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal." It ordered that the "pause" would take effect on January 28, 2025 at 5 p.m. and did not provide an end date for the pause.

51.     The OMB memorandum directed federal agencies, "for each Federal financial assistance program: (i) assign responsibility and oversight to a senior political appointee to ensure Federal financial assistance conforms to Administration priorities; (ii) review currently pending Federal financial assistance announcements to ensure Administration priorities are addressed, and, subject to program statutory authority, modify unpublished Federal financial assistance announcements, withdraw any announcements already published, and, to the extent permissible by law, cancel awards already awarded that are in conflict with Administration priorities, and; (iii) ensure adequate oversight of Federal financial assistance programs and initiate investigations when warranted to identify underperforming recipients, and address identified issues up to and including cancellation of awards."

52.     Notably, one EO, entitled "Realigning the United States Refugee Admissions Program," available at https://www.whitehouse.gov/presidential-actions/2025/01/realigning-the-united-states-refugee-admissions-program/, purported to direct the State Department not to admit additional refugees into the United States. Regardless of the legality of such a directive given the separate Congressional mandates to the State Department under the Refugee Act, however, neither that EO nor any other contained any executive order to freeze or withhold funds for the RRP programs serving individuals or families who were already lawfully admitted to the United States—nor would any such order or action be lawful in light of the Congressional mandates and appropriations described above.

53.     A separate Executive Order titled "Protecting the American People Against Invasion," dated January 20, 2025, directed the Attorney General and the Secretary of Homeland Security to review all "contracts, grants, or other agreements providing Federal funding to non-governmental organizations supporting or providing services" to immigrants *without legal status*, and to pause disbursement of funds pending the results of the review. Again, this EO neither directed, nor could it direct, any executive action to freeze or withhold funds from RRP programs serving individuals or families who were present in the United States with documented legal status.

54.     Individuals and families who qualify for the Refugee Resettlement Program—mainly from countries such as Cuba, Afghanistan, and Ukraine—have received documented, legal status within the United States pursuant to longstanding statutory authority. In short, as the Congressional purpose described above makes clear—these are documented immigrants receiving Congressionally mandated benefits.

55.     Defendants nevertheless did, indeed, freeze all grant funds under RRP and other programs. Many federal funding recipients, including CCFW, attempted to draw down funds from Payment Management System ("PMS"), which provides centralized electronic grant and grant-type

payment, cash management, and grant accounting support services to HHS. As well documented by contemporaneous press reports and court filings, including Defendants' own admissions, the chaos Defendants caused through their sudden and unexplained freeze resulted in a rush by thousands of grantees to draw down funds through PMS, leading to a crash of the PMS system.

56.    The ability to drawdown federal grant funds in advance is a core principle of federal grant law. Under 45 C.F.R. § 75.305(b)(1), a federal grantee like CCFW "must be paid in advance, provided it maintains or demonstrates the willingness to maintain both written procedures that minimize the time elapsing between the transfer of funds and disbursement by the non-Federal entity, and financial management systems that meet the standards for fund control and accountability as established in this part."

57.    CCFW has successfully managed its ORR federal grants—and many other federal grants in past decades—and has never received an audit or other finding stating or suggesting that its financial management systems failed to meet this standard. It certainly did not receive any such finding in advance of the Defendants' freeze of CCFW's RRP funding.

58.    Other groups representing federal grantees and contractors filed lawsuits to block the implementation of the funding pause as contemplated in the OMB Memorandum. On January 28, 2025, the day that the funding pause was slated to take effect, one court granted a Temporary Restraining Order to block its implementation.

59.    On January 29, 2025, a new OMB memorandum was issued—M-25-14—stating that the original funding freeze memorandum was rescinded. The new memorandum, which was directed to "heads of executive departments and agencies," features a two-sentence statement reading: "OMB Memorandum M-25-13 is rescinded. If you have questions about implementing the President's Executives Order, please contact your agency General Counsel."

### C.   CCFW SUBMITS DRAWDOWN REQUESTS TO ACCESS FUNDING

60.   On January 29 and 30, 2025, CCFW made four different requests for payment under PMS.

61.   On January 29 at 9:42 a.m., CCFW requested $2,613,882.85. As of February 26, the payment request remains unfulfilled and the status is listed as "request in transit."

62.   On January 29 at 10:51 a.m., CCFW requested $1,028.87. As of February 26, the payment request remains unfulfilled and the status is listed as "request in transit."

63.   On January 29 at 3:46 p.m., CCFW requested $16,050,866.85. As of February 26, the payment request remains unfulfilled and the status is listed as "request in transit."

64.   On January 30 at 11:39 a.m., CCFW requested $6,787,142.47. As of February 26, the payment request remains unfulfilled and the status is listed as "request in transit."

65.   On February 4, 2025, as CCFW's initial payment requests remained pending, CCFW communicated with Mr. Ken Tota, Bureau Chief of the Refugee Program Bureau within the Office of Refugee Resettlement, about the status of the payment requests.  Mr. Tota responded: "We are working to process payments.  We kindly request the general ledger (GL) detail that supports the following draw requests you made from PMS as per the list provided that includes your full accounting record for the draw request at the transaction level with a crosswalk to the identified requested payments to your accounting record along with details as to the specific products, services, and/or personnel costs associated with these requests for payment."  CCFW responded less than 90 minutes later to Mr. Tota with the documentation that he requested in support of CCFW's draw down requests; however, the status of CCFW's payment requests has not changed.

66.   CCFW also e-mailed ORR on February 3, February 7, and February 10 regarding the status of the requested funds, but has not received any response.

67.    Following those initial drawdown requests, CCFW continued to make additional requests via PMS during the week of February 10th and following. In total, CCFW's fourteen drawdown requests made in the weeks following the chaos of the federal funding pause—and subsequent purported rescission of that pause—totaled a combined $36 million.

68.    On February 17, 2025, CCFW sent a letter to Ben Goldhaber, the assistant secretary for the Administration of Children and Families ("ACF"), seeking ACF's "urgent assistance" in facilitating the processing of CCFW's payments requests submitted through PMS.  The letter informed ACF that neither CCFW nor its large network of partner agencies had the wherewithal to cover the cash flow necessary to operate such a large program and that, because CCFW has not received any of the requested funds, its partner agencies would have to lay off staff and close offices. CCFW has not received any response from ACF to the February 17 letter.

### D.  COURT ISSUES PRELIMINARY INJUNCTION BLOCKING ANY IMPLEMENTATION OF THE FUNDING FREEZE

69.    As indicated above, on February 25, 2025 Judge AliKhan of this Court granted a preliminary injunction blocking any continued attempts by Defendants to freeze federal grant funds, including those at issue in this case.

70.    Judge AliKhan took note of statements and actions of Defendants that appeared to evince a purposeful attempt to evade the orders of this Court and that of the District Court for the District of Rhode Island in a parallel case. Noting the statements of the White House press secretary, Judge AliKhan wrote: "By any reading of the Press Secretary's remarks, the memorandum's retraction was an empty gesture. At best, it was meaningless. At worst, it was a brazen attempt to deprive the court of jurisdiction without actually altering course."

71.    Judge AliKhan further took judicial notice of the opinion of the Rhode Island district court finding that the Defendants had continued to freeze certain funds—much as Defendants have

done with CCFW—in violation of that court's order. "Defendants cannot convincingly tell *this* court that there is no longer a need for injunctive relief after they were found to be in violation of *another* court's order." (emphasis in original)

72.    Accordingly, Judge AliKhan ordered Defendants preliminarily enjoined from continuing any freeze of federal grant funds in any form or under any name or pretense—including the frozen grant funds obligated to CCFW.

### E.    THE FUNDING FREEZE HAS INFLICTED IRREPARABLE HARM ON CCFW'S OPERATIONS AND MISSION

73.    As a result of Defendants' unlawful freeze of CCFW's funds, CCFW has witnessed and experienced widespread harm across the many programs and services that CCFW, through its partners and subrecipients, offer to eligible individuals and families.  For example, over 10,000 individuals to whom CCFW provides services have not been able to receive their RCA payments, which has led to evictions from apartments, apartment occupancy dropping, and the potential that apartment complexes will not be able to operate and owners will have to sell and shut down operations.

74.    As of the end of February 2025, CCFW has seen a 64% drop in its partners' staffing capacity, and that continues to grow daily. CCFW has witnessed nearly 750 partner agency staff laid off or furloughed since the funding freeze took effect. These layoffs are leading to unemployment issues and housing struggles as the employment market is now flooded with unemployed non-profit staff. Not least, these layoffs prevent CCFW from fulfilling its mission as RD and as a provider of RRP assistance.

75.    Many refugee programs across the state have shut down services to walk-in clients due to staffing capacity, and many of them have also had to shut down services to clients that were currently enrolled in programs. Without the assistance of these programs, individuals and families whom the United States government documented, admitted, and established as eligible are going

without assistance in finding a job and navigating the hiring process; navigating a complex healthcare system; receiving assistance enrolling children in and navigating school systems; and participating in educational opportunities to learn English, all of which are parts of the Congressional mandate to aid these individuals' integration into communities across Texas.

76.    Significantly, CCFW and its partners have seen that the funding freeze has seriously eroded trust and confidence within the communities with whom they have engaged to encourage the welcoming of individuals and families who are lawfully-admitted to the United States under the Congressionally-approved authorities described above.  That damage is lasting and irreparable.

**CAUSES OF ACTION**

**COUNT 1**

**APA—VIOLATION OF STATUTORY AUTHORITY, APPROPRIATIONS, AND THE SPENDING CLAUSE**

77.    Plaintiff incorporates the preceding paragraphs by reference.

78.    The Administrative Procedure Act authorizes this Court to hold unlawful and set aside agency action that is "contrary to constitutional right, power, privilege or immunity," "in excess of statutory jurisdiction, authority or limitation, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(B)-(D).

79.    Defendants' actions to freeze all funding designated for CCFW undermines the Constitution's separation of powers, contravenes statutes requiring the government to provide certain forms of refugee assistance, and violates the Impoundment Control Act's substantive requirements.

80.    The Constitution vests the power of the purse in Congress.  The Appropriations Clause and Article I ensure "that public funds will be spent according to the letter of the difficult judgments

reached *by Congress* as to the common good and not according to the individual favor of Government agents." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 427–28 (1990) (emphasis added).

81.   The Spending Clause vests Congress with the power to direct Treasury funds and to expend those funds for the "general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. Courts have consistently interpreted the Spending Clause as allowing Congress to impose requirements for the Executive Branch to spend federal funds.

82.   When the Executive Branch ignores Congress's instructions, it arrogates to itself Congress's power of the purse. Here, by failing to remit payments to CCFW under the Congressionally mandated and appropriated Refugee Resettlement Program, Defendants have unlawfully defied Congressional authority. First, the funding freeze contravenes Congress's command that the government must promptly provide certain services to admitted refugees, as reflected in the authorizations and appropriations cited above. *See, e.g.,* Consolidated Appropriations Act of 2023, Pub. L. 117-328, 136 Stat 4459, 4870-71 (Dec. 29, 2022) (appropriating over $6.3 billion for RRP to be available through Sept. 30, 2025); Pub. L. 117-180, 136 Stat. 2114, 2123 (Sep. 30, 2022) (Afghan refugee appropriation in amount of $1,775,000,000 available through Sep. 30, 2025).

83.   Moreover, the funding freeze as applied to CCFW is unlawful because it violates the Impoundment Control Act. The Impoundment Control Act provides for procedural requirements for deferring budget activities required by Congress. If an agency intends to defer spending money that it has been appropriated, "the President shall transmit" a special message to Congress specifying, among other things, how much budget authority he wishes to defer and for how long, the specific projects or governmental functions involved, his reasons and legal authority for doing so, and the "fiscal, economic, and budgetary effect of the proposed deferral." 2 U.S.C. § 684(a).

84.    The Impoundment Control Act imposes substantive limits on the Executive Branch's authority to defer budget authority. Defendants' decision to pause the disbursement of all funds to CCFW effects a "deferral of budget authority" within the meaning of the Act because it has halted disbursement of $36 million in funds that Congress has appropriated for refugee resettlement support services.

85.    Accordingly, Defendants' decision to pause funding violates statutory authority, appropriations statutes, and the Impoundment Control Act, all of which contravene the Constitution's separation of powers—and thus are unlawful.

## COUNT II

## ADMINISTRATIVE PROCEDURE ACT

## ARBITRARY AND CAPRICIOUS AGENCY ACTION

86.    Plaintiff incorporates the preceding paragraphs by reference.

87.    The APA authorizes this Court to hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

88.    The funding freeze, as applied to CCFW, represents an arbitrary and capricious agency action. Defendants have given no reasoned explanation for their decision to halt all funding for CCFW, as indeed they could not, and have ignored their own regulations. As described above, Defendants have ignored repeated requests from CCFW for *any* explanation.

89.    First, under federal grant law, a federal grantee like CCFW "must be paid in advance, provided it maintains or demonstrates the willingness to maintain both written procedures that minimize the time elapsing between the transfer of funds and disbursement by the non-Federal entity, and financial management systems that meet the standards for fund control and accountability as

established in this part." *See* 45 C.F.R. § 75.305(b)(1). Defendants have offered no explanation, as indeed they could offer none, how their decision to freeze all of CCFW's federal funding complies with the advance payment provisions of 45 C.F.R. § 75.305(b)(1).

90.    Moreover, Defendants have demonstrated no reasoned decision making—as again, they could not—given the serious and detrimental harms their sudden and prolonged funding freeze has had on CCFW, its partner agencies, and the individual RRP beneficiaries CCFW serves, including irreparable damage to CCFW's reputation, relationships, and mission, and to individuals and families who may lose essential supportive services—including access to housing, education, and job training—during their period of eligibility for RRP services.

91.    No statute or regulation requires or permits Defendants to persist in their freeze of payments to CCFW. Even if the Executive Orders described above could somehow satisfy the requirements for legal authority under the Administrative Procedure Act—which they cannot—as described, no Executive Order directs or permits Defendants to freeze funds for RRP supportive services for eligible individuals whom the federal government has previously documented and admitted.

92.    As also previously indicated, Defendants have not articulated, nor could they articulate, any other basis to depart from their own regulatory prompt payment requirements that they incorporated into their grant award. The government's departure from its own regulations, without explanation, independently violates the APA.

93.    For these reasons, the government's refusal to unfreeze CCFW's funds is arbitrary and capricious in violation of the APA.

## <u>REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiff Catholic Charities, Diocese of Fort Worth, Inc., respectfully requests that this Court enter judgment on its behalf, providing the following relief:

1.     Declare that Defendant HHS's funding freeze for the refugee resettlement program, as applied to CCFW, violates the Refugee Act of 1980, the Impoundment Control Act, and the separation of powers;

2.     Declare that Defendant HHS's funding freeze for the refugee resettlement program, as applied to CCFW, is arbitrary and capricious under the APA;

3.     Hold unlawful and set aside the refugee resettlement funding freeze as applied to CCFW;

4.     Enjoin—temporarily, preliminarily, and permanently—Defendants from taking any action enforcing or implementing against CCFW any version of a funding freeze pertaining to the refugee resettlement program; and

5.     Afford CCFW other and further relief as the Court deems just and equitable.

Dated: March 3, 2025                              Respectfully submitted,

_____
**Feldesman Leifer LLP**
Edward T. Waters (D.C. Bar No. 422461)
ewaters@feldesman.com
Mindy B. Pava (D.C. Bar No. 995328)
mpava@feldesman.com
Stephen Kuperberg (D.C. Bar No. 462992)
skuperberg@feldesman.com
1129 20th Street NW, 4th Floor
Washington, DC 20036
(*t*) (202) 466-8960

***Attorneys for Plaintiff Catholic Charities, Diocese of Fort Worth, Inc.***