**Feldesman Leifer LLP**
Edward T. Waters (D.C. Bar No. 422461)
ewaters@feldesman.com
Mindy B. Pava (D.C. Bar No. 995328)
mpava@feldesman.com
Stephen Kuperberg (D.C. Bar No. 462992)
skuperberg@feldesman.com
1129 20th Street NW, 4th Floor
Washington, DC 20036
(*t*) (202) 466-8960
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CATHOLIC CHARITIES, DIOCESE OF FORT WORTH, INC., d/b/a CATHOLIC CHARITIES FORT WORTH, 249 Thornhill Dr., Fort Worth, Texas 76115** | |
| *Plaintiff*, | Civil No.  1:25-cv-00605 |
| v. | |
| **U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES (DHHS), 200 Independence Avenue, S.W. Washington, D.C. 20201,** | |
| **and** | |
| **ROBERT F. KENNEDY, JR., SECRETARY OF DHHS, IN HIS OFFICIAL CAPACITY ONLY, 200 Independence Avenue, S.W. Washington, D.C. 20201** | |
| *Defendants*. | |

## <u>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER</u>

Shortly after the new Trump Administration took office in January 2025, Administration officials attempted to unlawfully freeze federal grant funds across the federal government's operations via OMB Memorandum M-25-13, including grant funds obligated to Plaintiff Catholic Charities Diocese of Fort Worth, Inc., d/b/a Catholic Charities Fort Worth ("CCFW") under four open federal grant awards. While the government later rescinded that attempt, and many entities have received their federal funding in the weeks since the attempted funding freeze, the spigot has remained shut for CCFW.

CCFW has not been able to draw down any of its requested $36 million in funds—and has not received any indication as to why its funds remain frozen.

That funding is necessary to cover the significant costs CCFW and its partner agencies incur every day to keep needed services flowing to documented and legally admitted individuals and families under the federal Refugee Resettlement Program ("RRP").  On January 29 and 30, 2025, CCFW made four different, routine requests to draw down a total of $25.4 million and followed those requests in the weeks after with 10 more requests, all as allowed in longstanding federal grant rules, specifically 45 C.F.R. §75.305.  In total, from January 29 through February 26, 2025, CCFW has made 14 requests, to draw down a combined total of $36,032,578.53. *See* Exh. A., Declaration of Jeffrey Demers ("Demers Decl.") at ¶ 10. Defendants ordinarily receive and pay such requests through their electronic Payment Management System ("PMS") within one or two days; over one month after CCFW made the initial requests, all 14 requests appear as "request in transit" in the PMS system—with no payment, and no further explanation. *Id*. at ¶ 10, 12.

Defendants' actions as applied to CCFW expressly violate the preliminary injunction order issued on February 25, 2025 by Judge Loren L. AliKhan of this Court. Judge AliKhan ruled that the Administration was preliminarily "enjoined from implementing, giving effect to, or reinstating under a different name the unilateral, non-individualized directives in OMB Memorandum M-25-13 with respect to the disbursement of Federal funds under all open awards" and that agencies may not take any steps to implement the federal funding freeze as contemplated by OMB Memorandum M-25-13. *National Council of Nonprofits v. OMB*, Civil Action No. 25-239, Dkt. No. 52 (Feb. 25, 2025).

Despite the presence of the preliminary injunction in the *National Council of Nonprofits* case, CCFW—and its many partner agencies, in addition to the eligible individuals who are the ultimate RRP beneficiaries—continue to experience significant, real-world harm as a result of the lack of incoming cash flow. Given that more layoffs and cuts to important program services are occurring each day while CCFW is prevented from drawing down funds, a temporary restraining order is critical—as it will allow CCFW to access its lawful grant funding until the Court has an opportunity to fully consider the scope of the payment issues and the illegality of Defendants' actions.

## BACKGROUND

Through its partner agencies as well as directly, CCFW provides comprehensive services and programmatic offerings to over 100,000 documented and lawfully-admitted individuals and families through the Congressionally-mandated and appropriated Refugee Resettlement Program ("RRP"). The RRP program provides assistance to refugees and other statutorily specified categories of admitted recent immigrants with documented legal status, primarily from Cuba, Afghanistan, and Ukraine, for whom the United States government has specifically granted entry

(and whom collectively the Office of Refugee Resettlement terms "refugees" for purposes of its services).

*CCFW's Refugee Resettlement Program in Texas*

For nearly fifty years, CCFW has provided essential services to these documented and lawfully-admitted individuals pursuant to Congressional mandates and appropriations. After the State of Texas withdrew from the federal government's refugee resettlement program in 2016, CCFW served as a Regional Replacement Designee for the North Texas region from February 2017 to October 2021; since October 2021, CCFW has served as the Texas statewide Replacement Designee (RD) responsible for coordinating the RRP among a state network of contractors and sub-recipients.

CCFW operates under four open and ongoing federal grant awards from Defendant HHS that are relevant to this case. Two of those grants are for Refugee Support Services (RSS), which includes fourteen (14) sub-programs, including but not limited to English language instruction, job readiness and placement services, civics instruction to prepare for completion of the U.S. Citizenship and Immigration Service (USCIS) Naturalization Interview and Civics Test, pre-high school equivalency instruction to prepare for a standard General Educational Development (GED) course or to take the GED Exam, and vocational training. The other two grants are for Refugee Cash and Medical Assistance programs (CMA), which provide up to 12 months of cash assistance for individuals ineligible for Temporary Assistance for Needy Families (TANF) and also provide up to 12 months of medical coverage to ORR-eligible populations who are ineligible for Medicaid.

*Advance Payment with the New Administration*

4

On January 27, 2025, Matthew J. Vaeth, acting director of the Office of Management and Budget, issued a memorandum, M-25-13, titled "Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs." This memorandum was issued less than two weeks after CCFW received a letter approving its FY 2025 State Plan as the State of Texas RD.[1] The OMB Memorandum stated, in part, that all federal agencies "must temporarily pause all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency actions that may be implicated by the executive orders . . . .". It ordered that the "pause" would take effect on January 28, 2025 at 5 p.m. and did not provide an end date for the pause.

Although the Trump Administration has issued Executive Orders seeking to limit immigration and the admission of new refugees, those Executive Orders do not apply to the programs offered by CCFW's network of partners and subrecipients, which provide domestic assistance and supportive services to refugees and other admitted immigrants with documented legal status, primarily from countries such as Cuba, Afghanistan, and Ukraine, for whom the United States government has specifically granted entry and identified as eligible to receive services under the RRP. 8 U.S.C. § 1522(a)(3). CCFW has not received any notifications asserting that new policy priorities have changed the government's ability to fund CCFW's existing grants.

The announcement of the funding pause led to much confusion and uncertainty among all recipients of federal funding. Many federal funding recipients rushed to draw down funds from Payment Management System ("PMS"), which provides centralized electronic grant and grant-type payment, cash management, and grant accounting support services to HHS. This urgency to draw down funds led to considerable problems with PMS, and likely crashed the system meaning

---

[1] *See* Compl. ¶ 42; Compl. Exhs. A & B.

that entitles were unable to drawdown funds for a period of time. The confusion remained in place even after the government issued OMB Memorandum M-25-14, which stated that the original funding freeze memorandum was rescinded. That memorandum, which was directed to "heads of executive departments and agencies," featured a two-sentence statement reading: "OMB Memorandum M-25-13 is rescinded. If you have questions about implementing the President's Executives Order, please contact your agency General Counsel."

*Federal Payment and Audit Requirements*

The ability to draw down federal grant funds in advance is a core principle of federal grant law. Under 45 C.F.R. §75.305(b)(1), a federal grantee like CCFW "must be paid in advance, provided it maintains or demonstrates the willingness to maintain both written procedures that minimize the time elapsing between the transfer of funds and disbursement by the non-Federal entity, and financial management systems that meet the standards for fund control and accountability as established in this part." Simply put, the grant payment system is not designed to accommodate multi-week delays in payment. However, CCFW has experienced—and nearly one month later, is still experiencing—a complete freeze of its funding.

Moreover, CCFW, like all grantees receiving more than the threshold amount (currently $1.0M) in federal funding, is subject to annual audit under the Single Audit Act, 31 U.S.C. § 7501 *et seq.* The "Compliance Supplement" is an OMB issued document that provides guidance to auditors about what they should test for in a particular grant programs in a Single Audit Act audit. "Cash Management" is one of the tested "Compliance Requirements" for the funding received by CCFW under CFDA No. 93.566 (the Replacement Designee program at issue here). See pp. 1585, 1591 of the 2024 Compliance Supplement, https://www.fac.gov/assets/compliance/2024-Compliance-Supplement.pdf. CCFW's most recent

audit shows no audit findings whatsoever and certainly no findings concerning cash management, i.e., the requirements related to the draw down of federal funds the crux of the issue here. See p. 31 here: https://app.fac.gov/dissemination/summary/2023-12-GSAFAC-0000050843. The audit requirements and the actual audit of CCFW further highlight that there is no discernable basis for freezing CCFW's funding.

*CCFW's Efforts to Obtain Payment for the Costs of Operating its Refugee Programs*

On January 29 and 30, CCFW made four different requests for payment under PMS. CCFW's attempts to draw down funds continued—even after OMB Memorandum M-25-14 was issued and rescinded the originally-contemplated funding freeze. From late January through February 26, 2025, CCFW made 14 requests for payment via PMS totaling more than $36 million. See Demers Decl., ¶ 10. The following graphic represents a screenshot of CCFW's drawdowns to date:

## ⦿ MY PAYMENT REQUESTS (14)

|  | Transaction Number | Payee Account | Payment Type | Request Amount | Request Date | Due Date | Request Status |
|---|---|---|---|---|---|---|---|
| 1 | 4040463562 | 7M60P | ACH Payment | $ 685,903.95 | 2025-02-26 03:57:17 PM | 2025-02-27 | Request in Transit |
| 2 | 4040460935 | 7M60P | ACH Payment | $ 1,712,631.70 | 2025-02-25 03:14:27 PM | 2025-02-26 | Request in Transit |
| 3 | 4040460170 | 7M60P | ACH Payment | $ 1,233,522.72 | 2025-02-25 09:56:13 AM | 2025-02-26 | Request in Transit |
| 4 | 4040459585 | 7M60P | ACH Payment | $ 1,198,704.60 | 2025-02-21 01:51:05 PM | 2025-02-24 | Request in Transit |
| 5 | 4040459581 | 7M60P | ACH Payment | $ 60,933.00 | 2025-02-18 01:14:37 PM | 2025-02-19 | Request in Transit |
| 6 | 4040459580 | 7M60P | ACH Payment | $ 1,822,805.52 | 2025-02-18 11:53:58 AM | 2025-02-19 | Request in Transit |
| 7 | 4040444183 | 7M60P | ACH Payment | $ 336,043.97 | 2025-02-11 03:30:55 PM | 2025-02-12 | Request in Transit |
| 8 | 4040444180 | 7M60P | ACH Payment | $ 47,433.24 | 2025-02-10 03:39:11 PM | 2025-02-11 | Request in Transit |
| 9 | 4040444179 | 7M60P | ACH Payment | $ 2,881,380.87 | 2025-02-07 01:30:36 PM | 2025-02-10 | Request in Transit |
| 10 | 4040444178 | 7M60P | ACH Payment | $ 600,297.92 | 2025-02-07 12:28:36 PM | 2025-02-10 | Request in Transit |
| 11 | 4040444154 | 7M60P | ACH Payment | $ 6,787,142.47 | 2025-01-30 11:39:17 AM | 2025-01-31 | Request in Transit |
| 12 | 4040444151 | 7M60P | ACH Payment | $ 16,050,866.85 | 2025-01-29 03:46:20 PM | 2025-01-30 | Request in Transit |
| 13 | 4040416412 | 7M60P | ACH Payment | $ 1,028.87 | 2025-01-29 10:51:21 AM | 2025-01-30 | Request in Transit |
| 14 | 4040415952 | 7M60P | ACH Payment | $ 2,613,882.85 | 2025-01-29 09:42:13 AM | 2025-01-30 | Request in Transit |

All of these payment requests remain unfulfilled, with the status listed as "request in transit."

Despite repeated communications sent to Defendant HHS, CCFW has received no indication that any pending payment request—or future reimbursement request—will be paid or when the funding freeze, as applied to it, will be lifted.

### *CCFW's Efforts to Obtain Information from Defendants*

On February 4, 2025, as CCFW's initial payment requests remained pending, CCFW communicated with Mr. Ken Tota, Bureau Chief of the Refugee Program Bureau within the Office of Refugee Resettlement, about the status of CCFW's payment requests. Mr. Tota responded: "We are working to process payments. We kindly request the general ledger (GL) detail that supports the following draw requests you made from PMS as per the list provided that includes your full accounting record for the draw request at the transaction level with a crosswalk to the identified requested payments to your accounting record along with details as to the specific products, services, and/or personnel costs associated with these requests for payment." See Demers Decl., ¶ 11.  CCFW responded less than 90 minutes later to Mr. Tota with the documentation that he requested in support of CCFW's draw down requests; however, the status of CCFW's payment requests has not changed. CCFW also e-mailed ORR on February 3, February 7, and February 10 as to the status of the requested funds, but have not received any response. See Demers Decl., ¶ 12-13.

On February 17, 2025, CCFW sent a letter to Ben Goldhaber, the assistant secretary for the Administration of Children and Families ("ACF"), seeking ACF's "urgent assistance" in facilitating the processing of CCFW's payments requests submitted through PMS. See Demers Decl., ¶ 14-15. At the time, CCFW had submitted eight different requests, and none had been paid. The letter informed ACF that neither CCFW nor its large network of partner agencies had the

wherewithal to cover the cash flow necessary to operate such a large program and that, because CCFW has not received any of the requested funds, its partner agencies would have to lay off staff and close offices. See Demers Decl., ¶ 15. CCFW has not received any response from ACF to the February 17 letter.[2]

Defendants' actions in freezing CCFW's funds contradict the preliminary injunction issued in *National Council of Nonprofits* case, where Judge AliKhan determined that the pause to federal funding "placed critical programs for children, the elderly, and everyone in between in serious jeopardy" and reasoned that plaintiff non-profit organizations met their burden for a preliminary injunction "because the public's interest in not having trillions of dollars arbitrarily frozen cannot be overstated."

The same is true for CCFW. As each day passes without CCFW receiving the grant funding which it is entitled to, CCFW and its partners and most importantly the people they serve experience greater harm.

## LEGAL STANDARD

To obtain a temporary restraining order, "the moving party must show: (1) a substantial likelihood of success on the merits; (2) that it would suffer irreparable injury if the [temporary restraining order] were not granted; (3) that [such an order] would not substantially injure other interested parties; and (4) that the public interest would be furthered" by the order. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (citations omitted).

---

[2] CCFW also directed its counsel to provide its correspondence with ACF to counsel for the government and plaintiffs in the D.R.I. and D.D.C. cases challenging the federal funding freeze. CCFW's counsel has received no response.

"When the movant seeks to enjoin the government, the final two TRO factors—balancing the equities and the public interest—merge." *D.A.M. v. Barr*, 474 F. Supp. 3d 45, 67 (citing *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)).

Courts in this Circuit generally apply a "sliding scale" approach, wherein "a strong showing on one factor could make up for a weaker showing on another." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022) (internal quotation marks and citation omitted) (reserving the question of "whether the sliding-scale approach remains valid"); *National Railroad Passenger Corp. (Amtrak) v. Sublease Interest Obtained Pursuant to an Assignment and Assumption of Leasehold Interest Made as of Jan. 25, 2007*, Case. No. 22-1043 (2024 WL 34443596, at *1-2 (D.D.C. July 15, 2024) (reasoning that district courts remain bound by sliding-scale precedent).

## ARGUMENT

All the factors for obtaining a temporary restraining order (TRO) weigh in favor of CCFW. First, CCFW can demonstrate a substantial likelihood of success on the merits because Defendants have violated both statutory authority and appropriations law by halting all funding designated for CCFW in violation of the Administrative Procedure Act. Defendants' freeze of its funding violates the U.S. Constitution's separation of powers, contravenes Congressional statutory mandates and appropriations requiring the government to provide the RRP services specified in the Refugee Act, and violates the preliminary injunction and other Orders of this Court as issued by Judge AliKhan. Moreover, the funding freeze, as applied to CCFW, represents an arbitrary and capricious agency. Defendants have offered, and could offer, no reasoned explanation for their decision to halt all funding for CCFW and ignore their own regulations governing grant funding—indeed, they have offered no explanation at all.

Second, CCFW can show that it is experiencing irreparable injury necessitating emergency relief. CCFW has witnessed nearly 750 partner agency staff laid off or furloughed since the funding freeze took effect, with many programs shutting down services to walk-in clients due to staffing capacity. By way of one concrete example, CCFW's partner agencies generally offer Refugee Cash Assistance payments to individuals who participate in that program.  To date, approximately 10,000 individuals who participate in that program have missed their payments, with an additional 1,500 individuals expected to miss payments again this week, without funding. The Defendants' freeze on CCFW's funding led to evictions of eligible RRP beneficiaries from apartments, apartment occupancy dropping, and the potential that apartment complexes will not be able to operate. See Demers Decl., ¶ 21. Injury here is not only imminent: it is happening every day in which CCFW's funding requests remain unfulfilled.

Finally, the public interest is plainly not furthered by violations of the law. To the contrary: Defendants' inexplicable refusal to obey the Orders of this Court and others have contravened the express public policy articulated by Congress in its enactment of the Refugee Act and other authorizing statutes. Not only have Defendants harmed CCFW and the RRP beneficiaries—they have caused and continue to cause violence to the principles that Congress articulated in 1980 and that still appear echoed on Defendants' website as "reflecting [America's] core values and our tradition of being a safe haven for the oppressed":

> [I]t is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands, including, where appropriate, humanitarian assistance for their care and maintenance in asylum areas, efforts to promote opportunities for resettlement or voluntary repatriation, aid for necessary transportation and processing, admission to this country of refugees of special humanitarian concern to the United States, and transitional assistance to refugees in the United States….

Declaration of Policies and Objectives for title IV of the Immigration and Nationality Act, also known as the Refugee Act of 1980, Pub. L. 96-212, title I, § 101, 94 Stat. 102 (Mar. 17, 1980); *see*

*also* HHS Office of the Administration for Children & Families, Office of Refugee Resettlement, "History," available at https://acf.gov/orr/about/history (accessed on February 23, 2025).

Accordingly, this Court should issue a temporary restraining order that restores CCFW's funding and prevents CCFW's partner agencies—and the individuals which they serve—from suffering additional harm until the Court has the opportunity to consider this case in full.

## I.    Plaintiff is likely to succeed on the merits of its claim.

Defendants' decision to block CCFW from receiving any funding after CCFW made routine requests for advance payments violates the Spending Clause, deviates from statutory authority, runs counter to established principles of federal grant law, is arbitrary and capricious under the APA, and defies Judge AliKhan's preliminary injunction order instructing agencies to resume all federal funding payments impacted by the chaos surrounding OMB Memo M-25-13. Accordingly, CCFW has demonstrated that it is likely to prevail on the merits of its claim against Defendants.

First, the Spending Clause vests Congress with the power to decide how appropriated dollars should be spent for the "general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. It is Congress, not the Executive Branch, who is vested with the power of the purse. Courts have consistently interpreted the Spending Clause as allowing Congress to impose conditions when spending federal funds. *See Fullilove v. Klutznick*, 448 U.S. 448, 474 (1980) (reasoning that Congress may "further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives.").[3] In its

---

[3] In its 1987 decision in *South Dakota v. Dole*, the U.S. Supreme Court held that authorizing acts creating grant programs are done so by Congress under the Spending Clause and such programs must be in pursuit of the "general welfare" of the United States.  In addition, the *Dole* Court held that any conditions attached to the receipt of federal funds must: (1) be unambiguously established so that recipients can knowingly accept or reject them; (2) be germane to the federal

1981 decision in *Pennhurst State School and Hospital v. Halderman*, the Supreme Court explained that a grant is "much in the nature of a contract" between the grantee and the federal government. As the Court reasoned, the "legitimacy of Congress' power to legislate under the spending power ... rests on whether the State knowingly and voluntarily accepts" the federally imposed conditions. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). The Court concluded that "[t]hough Congress' power to legislate under the spending power is broad, it does not include surprising participating States with postacceptance or 'retroactive' conditions." *Id.* at 25. As a result, the Court required that a funding condition be established "unambiguously" before acceptance of the grant, in order to allow the recipient to make an informed decision about the consequences of participating in the grant program.

Here, Congress' intent has been clear. Congress expressly created the Office of Refugee Resettlement ("ORR") within Defendant HHS "to fund and administer" refugee resettlement program services. 8 U.S.C. § 1521. Congress has authorized the Secretary of HHS to carry out these and other objectives through the making of grants to and contracts with public or private nonprofit agencies (such as with CCFW). 8 U.S.C. § 1522(a)(9); *see generally* 8 U.S.C. § 1522(b)-(e). More recently, Congress appropriated over $6.3 billion in funds for the continued operation of ORR's refugee resettlement activities under this statute and others, to be available through September 30, 2025, in the Consolidated Appropriations Act of 2023. Pub. L. 117-328, 136 Stat 4459, 4870-71 (Dec. 29, 2022). The Executive Branch does not have unilateral power to withhold federal funds that have been previously authorized by Congress and signed into law,

---

interest in the particular national projects or programs to which the money is directed; (3) not violate other provisions of the Constitution; and (4) not cross the line from enticement to impermissible coercion, such that states have no option but to accept the funding. *See* 483 U.S. 203 (1987).

and also does not have the power to impose its own "retroactive" conditions on the use of grant funds when Congress has not delegated the power to do so.

CCFW has four open grant awards to accomplish the very purpose outlined in the statute—to allow its subrecipients and partner agencies to provide supportive services to aid the resettlement of lawfully-admitted ORR-eligible individuals and families from countries such as Cuba, Afghanistan, and Ukraine. As recently as January 14, 2025—only two weeks before the government attempted to implement a wide-ranging, across-the-board freeze to all federal funding—ORR approved CCFW's Texas State Plan for Fiscal Year 2025 and deemed the plan compliant with ORR's regulations per 45 C.F.R. Part 400; the Afghanistan Supplemental Appropriations Act, 2022 and succeeding legislation; and the Additional Ukraine Supplemental Appropriations Act, 2022.[4]

While there is clear statutory authority for the Refugee Resettlement Program—and for CCFW's leadership as the RD for the State of Texas—statutory authority does not extend to Defendants' attempt to block CCFW from receiving its routine payments, without any notice, process, or explanation as to why. CCFW is a grant recipient that has been awarded four ongoing grants—to that end, it reasonably expects grant disbursements on a regular timetable and has organized spending, staffing, programs, and other obligations in accordance with that funding schedule. The ability to draw down federal grant funds in advance is a core principle of federal grant law. Under 45 C.F.R. §75.305(b)(1), a federal grantee like CCFW "must be paid in advance, provided it maintains or demonstrates the willingness to maintain both written procedures that minimize the time elapsing between the transfer of funds and disbursement by the non-Federal

---

[4] *See* Compl. ¶ 42; Compl. Exhs. A & B.

entity, and financial management systems that meet the standards for fund control and accountability as established in this part."

In addition, the HHS Grants Policy Statement reinforces the speed in which funds should be transferred to a grantee and then quickly paid: "In accordance with Department of Treasury regulations, you must draw federal cash only for your immediate needs. At time of draw down, you will certify you will not hold cash beyond three working days." https://www.hhs.gov/sites/default/files/hhs-grants-policy-statement-october-2024.pdf at p. 29. The grant payment system, quite obviously, is not designed to accommodate multi-week delays in payment. Grantees, for example, have never had to borrow significant working capital to finance federal programs as the advance payment system obviates the need for such financing. Defendants' decision to cast aside Congress's Spending Clause authority, statutory requirements and grant funding principles underscores that their position is unlawful and unjustifiable.

Defendants' decision to prevent CCFW from obtaining more than $36 million under its open grant agreements is also arbitrary and capricious. "Normally, an agency rule would be arbitrary and capricious if the agency . . . entirely failed to consider an important aspect of the problem . . . or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In weighing an agency's action, a court "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Id*.

Here, despite 14 different draw down requests by CCFW over a four-week period and multiple attempts by CCFW to get clarity from agency officials, Defendants have failed to supply any reasoning that could support their decision to freeze all grant funding designated for

15

CCFW without any sort of notice.[5] To the extent that Defendants believe that CCFW's programs run afoul of some new priority expressed by the Trump administration, none of the Executive Orders touch on the supportive services programs offered by CCFW's partners and subrecipients. All executive orders issued by the Trump Administration since January 20, 2025 in the immigration or refugee context focus on asylum-seekers attempting to enter the United States, not on supportive services for those who have already entered.

Moreover, Defendants' decision to keep CCFW's funds frozen undermines this Court's preliminary injunction instructing federal agencies to refrain from doing precisely that. On February 25, 2025 Judge AliKhan of this Court granted a preliminary injunction stopping Defendants from continuing any freeze of federal grant funds in any form or under any name or pretense—including the frozen grant funds obligated to CCFW. The Court's Order requires defendants to provide written notice of the preliminary injunction to all agencies to which OMB Memorandum M-25-13 was addressed, with the notice instructing the agencies that they cannot take any steps to implement, give effect to, or reinstate under a different name the directives in OMB Memorandum M-25-13 with respect to the disbursement of federal funds under all open awards. The notice also instructs those agencies to continue releasing any disbursements on open awards that were paused due to OMB Memorandum M-25-13. See *National Council of Nonprofits* (Dkt No. 52).

Defendants cannot lawfully continue to freeze CCFW's grant funds in contravention of this Court's unambiguous preliminary injunction Order; and accordingly, for that reason and those articulated above, CCFW is likely to prevail on the merits of this claim.

---

[5] The federal grant regulations do allow for withholding of payments, suspension of funding or even termination but only upon a showing of cause. 45 C.R.F. §75.371. Here, Defendants have taken extreme action without cause; Defendants are acting unlawfully as a result.

16

**II.    Plaintiff will suffer immediate, irreparable injury if the funding pause is not lifted.**

Defendants' refusal to unfreeze CCFW's requested payments has prevented CCFW and its partner agencies from providing critical and necessary services to the more than 100,000 families and individuals that they serve, across all of the Congressionally-mandated and appropriated RRP services. Across the State of Texas, individuals and families who rely on these supportive services are facing evictions, economic instability, and denials of access to healthcare, as service providers are being forced to shut down programs and lay off staff. These injuries are not speculative or even imminent; they are actively occurring and will continue to escalate absent relief from this Court.

To constitute irreparable harm, the D.C. Circuit has held that the injury "must be both certain and great," "actual and not theoretical," and "of such imminence that there is a 'clear and present' need for equitable relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). Additionally, the injury "must be beyond remediation," meaning that "[t]he possibility [of] adequate compensatory or other corrective relief . . . at a later date . . . weighs heavily against a claim of irreparable harm." *Id.* at 297–98.

In several recent court cases, including the *National Council of Nonprofits v. OMB* case referenced above, this Court has recognized that the denial of federal funding clearly meets the standard for irreparable harm—and warrants relief when it leads to reductions in programs and staff layoffs that deprive participants of critical support. See *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-239, 2025 WL 368852, at *12–13 (D.D.C. Feb. 3, 2025); *accord AIDS Vaccine Advoc. Coal. v. United States Dep't of State*, No. CV 25-00400, 2025 WL 485324 (D.D.C. Feb. 13, 2025) (granting TRO where agencies' refusal to distribute foreign assistance

funds forced program reductions and shutdowns, as well as employee furloughs and layoffs, constituting irreparable harm). CCFW suffers from parallel harms to the plaintiffs in those cases.

First, as a result of the freeze of its funding, CCFW and its partners have had to suspend programs that facilitate integration into the community, including job training and employment services, leaving individuals who participate in the specific job training and employment services program without the resources necessary to secure work and support their families. See Demers Decl., ¶ 19. Similarly, programs that provide access to medical services have been disrupted, preventing individuals from receiving essential healthcare. See Demers Decl., ¶ 20. The funding freeze has also resulted in widespread housing instability. Thousands of individuals who depend on RCA payments to cover their rent are now facing eviction. *Id.*, ¶ 21. This is not a hypothetical harm; evictions have already begun, leading to a drop in apartment occupancy rates and placing financial strain on property owners.

The lack of funding has also forced CCFW's partner agencies to significantly reduce their workforce: these partner agencies have experienced a 64% reduction in staffing, with nearly 750 employees already laid off or furloughed since CCFW's first draw down attempt on January 29. *Id.*, ¶ 22. These layoffs are not only harming the individuals who have lost their jobs, but are also making it increasingly difficult for providers to maintain operations. *See Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975) ("a substantial loss of business" and prospect of "bankruptcy" constitute irreparable harm). Absent relief from this Court, refilling these vacancies will be "virtually impossible." *See Nat'l Council of Nonprofits*, 2025 WL 368852, at *13. These harms prevent CCFW from fulfilling its mission as state RD and as a charitable nonprofit, to say nothing of the tangible and irreparable human tragedy each layoff reflects.

Further, CCFW's longstanding reputation as a reliable funding source across the State of Texas has been damaged by the lack of incoming funding. Community partners—including landlords, employers, and local agencies—are unable to depend on CCFW as they have historically. If, for example, rent payments to landlords are disrupted due to the funding freeze, landlords will be far less willing to house ORR-eligible individuals due to the inherent risk of relying on CCFW as a viable source of rent. Courts have recognized that this type of loss of trust and goodwill in such relationships constitutes irreparable harm. *See, e.g.*, *Alf v. Donley*, 666 F. Supp. 2d 60, 70 (D.D.C. 2009) (finding irreparable harm where the plaintiff's business connections deteriorated due to lost confidence in its reliability).

But beyond community partners, the funding freeze is destroying the reliance that the individuals and families served by CCFW and its partner agencies have placed in their programs and supportive services. Program recipients may no longer be able to depend on critical assistance when they need it most, a factor the court in *National Council of Nonprofits* recognized as irreparable harm. *See* 2025 WL 368852 at *13 ("patients or customers that rely on their services may be denied care when it is most needed."). Once disrupted, these programs cannot simply be switched back on; re-establishing trust with participants and bringing them back into these programs is far from a certainty.

For decades, CCFW and its partner agencies have justifiably relied on grant funding that the federal government approved and awarded; yet the unexplained funding freeze in place now has led to an untenable situation where many of the supportive services programs under CCFW's umbrella may need to shut their doors. If these essential services go unprovided in the State of Texas, the injury will be profound.

**III.    The balance of equities and public interest favors CCFW.**

For the same reasons that CCFW is likely to succeed on the merits, the balance of equity factor and public interest factor both also require that relief be granted in CCFW's favor.

"There is generally no public interest in the perpetuation of unlawful agency action." *Open Communities Alliance v. Carson*, 286 F. Supp.3d 148, 179 (D.D.C. 2017). On the other hand, "there is a substantial public interest in having governmental agencies abide by the federal laws—such as the APA, as well as regulations . . .—that govern their existence and operations." *Id*.

Here, Defendants' decision to freeze CCFW's funding runs counter to statutory authority, Congress' power of the purse to identify funding priorities, and Judge AliKhan's preliminary injunction order in *National Council of Nonprofits*. Because there is a substantial public interest in having government agencies abide by federal laws—and follow express court orders to refrain from a certain course of conduct—it is plain that this factor also favors CCFW.

By approving CCFW's four open grant awards, the government has already determined that CCFW is entitled to the funding at issue, and is entitled to pass down that funding to partner agencies to oversee important supportive services. It is unclear how Defendants would be injured simply by processing payments—a routine and standard practice within PMS—for grant awards that they have already approved in scope. In contrast, CCFW has demonstrated that its partner agencies would suffer imminent financial consequences if the requested funds are not remitted, and those effects would filter down to families and individuals who rely on the supportive services.

CCFW does not seek nationwide relief for all entities impacted by Defendants' funding delays or freezes. The impact of any decision by this Court would be limited to addressing—and

remedying—the specific harm experienced by CCFW (and partner agencies) as a result of the funding freeze. To that end, a decision by this Court to impose relief would be limited in scope, which further bolsters CCFW's assertion that both the balance of equities and public interest factors favor CCFW.

## CONCLUSION

For all of the foregoing reasons, CCFW respectfully requests that this Court grant its motion and enter a temporary restraining order that would enjoin Defendants from continuing to freeze CCFW's funding. CCFW further requests that this Court order that Defendants pay CCFW's lawful draw down requests, which approximates $36 million, as of February 26, 2025.

Dated: March 3, 2025

Respectfully submitted,

__/s/  Edward T. Waters_____

**Feldesman Leifer LLP**
Edward T. Waters (D.C. Bar No. 422461)
ewaters@feldesman.com
Mindy B. Pava (D.C. Bar No. 995328)
mpava@feldesman.com
Stephen Kuperberg (D.C. Bar No. 462992)
skuperberg@feldesan.com
1129 20th Street NW, 4th Floor
Washington, DC 20036
(*t*) (202) 466-8960

*Attorneys for Plaintiff Catholic Charities, Diocese of Fort Worth, Inc.*