UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **CATHOLIC CHARITIES,** **DIOCESE OF FORT WORTH, INC.,** *Plaintiff*, v. **U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,** *et al.,* *Defendants*. | Civil No. 1:25-cv-605 (LLA) |

### PLAINITFF'S REPLY IN SUPPORT OF ITS MOTION FOR TEMPORARY RESTRAINING ORDER

Catholic Charities, Diocese of Fort Worth, Inc. (CCFW) believes that federal agencies should have the ability to review grants that Congress mandates the agencies disburse, and that CCFW should be a good and transparent steward of federal funds. However, Defendants' justification for their continued freeze of CCFW's Congressionally obligated grants—now frozen for over six weeks on funds typically disbursed within days—is not only arbitrary, capricious, and unlawful, but demonstrably pretextual.

Before turning to a discussion of legal standards, CCFW must once again supply material facts that Defendants themselves failed to share with this Court. To recap: CCFW brought this action on March 3 after receiving no response from Defendants to repeated inquiries regarding the status of over a dozen draw down requests made in the course of the previous six weeks. Not until March 5, in response to this Court's Order, did Defendants produce a February 3

1

"Secretarial Directive," Dkt. No. 11 Exh. A., on which Defendants claim to base their continued freeze of CCFW's draw downs. *See also* Gov. Opp. Br. (Dkt. 15) at 1.

Defendant HHS issued the "Secretarial Directive" on the same day that this Court issued its Memorandum Opinion and Order on Plaintiff's Motion for a Temporary Restraining Order in *National Council of Nonprofits v. OMB*, Civ. No. 25-239, (Feb. 3, 2025; Dkt. No. 30 in *Nat'l Council of Nonprofits* case), ordering that the government was, among other things, "enjoined from implementing, giving effect to, or reinstating under a different name the directives in OMB Memorandum M-25-13 with respect to the disbursement of Federal funds under all open awards." *Id.* Defendants were forced to concede in their March 5 Notice that "the Secretary did not post the Directive on the agency's website and did not provide a copy of the Directive to contractors, vendors, or grantees," including CCFW—and certainly did not provide a copy to this Court as part of their status report as required in the *National Council of Nonprofits* February 3 Order. (Notice, Dkt. No. 11.)

The Directive's own purported basis for the funding pause—"a March 2023 report published by a Florida [state] grand jury regarding waste, fraud, and abuse in immigration programs"—turns out to be wholly pretextual. Although Defendants neglected to provide this Court with the Florida state grand jury's March 2023 report, that report—located by CCFW after Defendants' filing, and attached as Exhibit 1 to this Reply—makes clear on its first page not only that ***it raises no concerns regarding the type of refugee programs supported by CCFW, but in fact commends them for their work.***[1] On its first page, the Florida state grand jury report on which Defendant's February 3 Directive relies states:

---

[1] Third Presentment of the Twenty-First Statewide Grand Jury Regarding Unaccompanied Alien Children ("UAC"), available on the Florida Department of Children and Families website at: https://www.myflfamilies.com/sites/default/files/2024-

> We focus herein on the treatment of UAC only; *though similarly situated, Unaccompanied Refugee minors* undergo a different process and have a different legal situation; accordingly, they *are not the subject of our discussions herein. We further commend organizations* such as Lantern Rescue *for their important work* in identifying and *assisting actual refugee populations*.

*Id.* at 1 n.1 (emphasis added).

To review, then, some of the abnormal circumstances in which this Court considers emergency relief from Defendants' continued freeze of CCFW's draw down requests are as follows:

- OMB first issued a government-wide freeze on grant funds on January 28;

- Confronted with this Court's order granting temporary relief from that freeze, OMB claimed on January 29 to rescind the government-wide freeze, while the White House press secretary published an announcement that the freeze was still in effect, *see, e.g.*, Mem. Op. & Order, *Nat'l Council of Nonprofits*, Civ. No. 25-239, at 4 (Feb. 3, 2025);

- On the same day, February 3, on which this Court issued an Order, among other things, enjoining Defendants from "implementing, giving effect to, or reinstating under a different name the directives in OMB Memorandum M-25-13 with respect to the disbursement of Federal funds under all open awards" and to "instruct [their] agencies to release any disbursements on open awards that were paused," *id.* at 29, Defendants issued a "Secretarial Directive" that, in fact, freezes the disbursement of Federal funds under all open awards made by the Administration for Children and Families to contractors, vendors and grantees related to immigration and refugee resettlement;

---

05/Grand%20Jury%20Presentments_0.pdf (accessed March 8, 2025) (attached as Exhibit 1); see Case No. SC22-796 (Fl. S. Ct., Mar. 2023).

3

- Contrary to their own regulations requiring notice to grantees of changes in grant conditions, *see infra*, Defendants not only failed to communicate this Directive to any of its contractors, vendors, or grantees (including CCFW), but also failed to post this Directive to its website or provide a copy to this Court—despite the Court's February 3 Order in *Nat'l Council of Nonprofits* requiring Defendants to "file a status report on or before February 7, 2025, apprising the court of the status of their compliance," *id.* at 30;

- After Defendants' Ken Tota requested CCFW's general ledger detail on February 4 (without notifying CCFW of the Directive or any other change affecting CCFW's grants or draw down requests), CCFW responded within 90 minutes with 22 PDF pages and four Excel files, *see* Demers Declaration (Dkt. No. 9-2 attached to Plaintiff's TRO Motion) at ¶ 12), and yet for over a month, CCFW has still received no further explanation or unfreezing of its funds;

- Despite repeated requests by CCFW for information regarding the status of CCFW's draw down requests, including a February 17 letter to ACF, Defendants offered no information or explanation prior to CCFW bringing this case;

- Despite the Directive's language that it "shall be implemented through the Department's payment management system by personnel with responsibility for that system who shall, in doing so, comply with all notice and procedural requirements," and that ACF will provide a "prompt review" for frozen payments, *see* Notice, Dkt. No. 11, Exh. A, the Payment Management System "All Details" tab reflects repeated entries by Defendants' own PMS staff, both prior to and following the February 3 Directive, indicating that CCFW's draw down requests are "Ok to pay" and that "ACF has approved this

4

payment," *see* Dkt. No. 14-3, and yet Defendants neither provided any notice or other explanation to CCFW, nor unfroze CCFW's draw down requests; and

- Not least, the sole premise in the February 3 Directive by which Defendants seek to distinguish their conduct from this Court's February 3 and other Orders in *Nat'l Council of Nonprofits*: "the Secretary's pause was based on a separate predicate—namely, findings by a Florida state grand jury—not the OMB memorandum," Gov. Opp. Br. (Dkt. 15) at 12; is premised on a years-old state grand jury finding which, **on its first page**, clarified that it had nothing to do with refugee programs and had only praise for their operations.

In short, none of the circumstances described above are normal—in any form.

And those abnormalities do not address other bizarre and unexplained facts, for example: (i) the unexplained premise for the freeze of grant draw downs, as the February 3 Directive concedes, that "it is currently impossible to access sufficient information from a centralized source within the Department of Health and Human Services to assess" the allegations regarding eligibility concerns for the Unaccompanied Alien Children—***not*** the Refugee Resettlement Program—as, indeed, by statute, HHS is not responsible for RRP eligibility but rather DHS, INS, and the State Department are; (ii) how freezing grant draw down requests would permit Defendants to reach any meaningful conclusions on those subjects; (iii) why Defendants would choose to freeze grant draw downs and instruct the PMS staff to conduct such a review when reviews for fraud, waste, and abuse fall under the purview of the HHS Office of Inspector General and not PMS; (iii) why Defendants could not avail themselves of the regulatory provisions for grant fund reviews, *see infra*; or (iv) why Defendants would fail to notify anyone

outside HHS, including this Court in *Nat'l Council of Nonprofits* case, of the freeze, or any particularized justification, status, or progress prior to CCFW's filing this case.

In light of the foregoing, it is difficult to credit Defendants' assertions, for example, that "[t]here is clearly a rational connection between the troubling allegations contained in the Florida state grand jury report and the Secretary's choice to pause funding." Govt. Opp. Br. (Dkt. 15) at 10. Not so. Again, CCFW takes no issue generally with transparency and careful stewardship of its and all federal grant funds; but all evidence, even in an emergency setting without having yet had opportunity for discovery into Defendants' claims, indicates not only no rational basis for Defendants' actions, but rather a pretextual one.

## LEGAL DISCUSSION

Despite the circumstances precipitated by Defendants' own actions, Defendants' Opposition attempts to raise normal arguments in defense of the abnormal. Nevertheless, CCFW has demonstrated that it is likely to succeed on the merits, will suffer irreparable injury in the absence of relief, and the equities and public interest favor granting that relief. Regarding the four-factor TRO analysis, CCFW refers the Court to its original memorandum in support of the motion for a full analysis of those factors. (See Dkt. No. 9.)  Below, CCFW responds to certain specific arguments raised in Defendants' Opposition:

### A.     Defendants' Freeze of CCFW's Grant Draw Downs Constitutes Final Agency Action

As this Court explained in its Orders granting temporary restraining and preliminary injunctive relief in the *Nat'l Council of Nonprofits* case, Defendants' freeze of CCFW's grant down requests—as Defendants have now revealed, as a result of the February 3 Directive—constitutes final agency action. To paraphrase:

> [Defendants'] characterization, however, is in tension with the language of the [Directive] and the facts on the ground. Defendants' assertion that the [Directive] 'did not itself determine which funds or grants should be paused' is true, but not in a way that helps them. [The Directive] did not specify certain funds to be frozen; it froze *all* of them…. It is a directive that immediately produced legal consequences across the entire [ACF] funding system…. By any measure, Defendants' action led to legal consequences and constituted final agency action.

Mem. Op. & Order, *Nat'l Council of Nonprofits v. OMB,* Civ. No. 25-239, Dkt. No. 30, slip op. at 22-23 (Feb. 3, 2025) (AliKhan, J.) (emphasis in original).[2]

### B.  The Federal Grants System Is Premised on Advance Payments, Demonstrating that Defendants' Freeze is Contrary to Law

The statutes and regulations applicable to Refugee Resettlement Program grants require advance payments and do not permit HHS to freeze advance payments—certainly not based on an unrelated program in an unrelated state—providing clear authority that Defendants' freeze was and is contrary to law.

Unlike the federal contracts system, the federal grant system is premised on advance payments:

> The non-Federal entity **must be paid in advance**, provided it maintains or demonstrates the willingness to maintain both written procedures that minimize the time elapsing between the transfer of funds and disbursement by the non-Federal entity, and financial management systems that meet the standards for fund

---

[2] CCFW notes the closing remark in the Declaration by ACF's Andrew Gradison, attached to Defendant's Opposition, that ACF expects their "review … to conclude soon and a decision will be made with respect to the funding pause in a matter of days." (Govt. Opp. Exh. A, Dkt. No. 15-1 at ¶ 14.) As this Court is well aware, Defendants have often taken additional, unjustified steps in the past two months regarding federal grants in an attempt to circumvent court rulings. *See, Nat'l Council of Nonprofits v. OMB,* Civ. No. 25-239, Dkt. No. 30; *see also U.S. Conf. of Catholic Bishops v. State*, Case No. 25-465, Dkt. No. 30-2 (D.D.C. Mar. 3, 2025); *AIDS Vaccine Advocacy Coalition v. State*, Case No. 25-400, Dkt. No. 35 (D.D.C. Feb. 25, 2025). Even if Defendants arrive at this Court's March 12 hearing with a "surprise" and attempt to argue that this court no longer has jurisdiction, this Court should find this matter is not moot and that jurisdiction remains proper with this Court so that this Court may take action to ensure that CCFW's draw downs are not impeded, now or in the future, by actions contrary to law under the APA. *See Nat'l Council of Nonprofits*, Dkt. No. 30.

>control and accountability as established in this part. Advance payments to a non-Federal entity must be limited to the minimum amounts needed and be **timed to be in accordance with the actual, immediate cash requirements** of the non-Federal entity in carrying out the purpose of the approved program or project. The timing and amount of advance payments **must be as close as is administratively feasible to the actual disbursements** by the non-Federal entity for direct program or project costs and the proportionate share of any allowable indirect costs. The non-Federal entity **must make timely payment to contractors** in accordance with the contract provisions.

45 C.F.R. §75.305(b)(1) (emphasis added). The advance payment mandate holds even more strongly for entities like CCFW that operate as a Replacement Designee for a state agency. *See, e.g.,* 45 C.F.R. §400.11(e)(2) ("The State may draw funds, under the Department's Payment Management System [PMS], as needed, to meet the Federal share of disbursements.") [3]

Moreover, HHS's regulations—including the regulations cited in Defendants' February 3 Directive—require that *before* freezing, changing, or otherwise conditioning draw down advance payments, the HHS awarding agency must *first* reach a particularized determination that an individual grantee, here CCFW, has failed to comply with the Federal statutes, regulations, or the terms and conditions of a Federal award. *See* 45 C.F.R. § 75.371; *see also* Notice Exh. A, Dkt. No. 11 (citing this regulation). Even then, the HHS awarding agency must first *notify* the grantee, among others, as to the "reason why the additional requirements are being imposed," "[t]he nature of the action needed to remove the additional requirement, if applicable," and "[t]he method for requesting reconsideration of the additional requirements imposed." *See* 45 C.F.R. § 207(c); *see also* 45 C.F.R § 75.371 (citing these provisions).

Suffice to say HHS made no such individualized determinations regarding CCFW before imposing its grant draw down freeze, and indeed could not; nor did HHS even attempt to provide

---

[3] Replacement Designees are considered "states" for the purposes of the RRP program with some limited exceptions, none of which apply here. 45 C.F.R. §400.301(c).

the required notice; and accordingly, Defendants' claimed basis for their freeze of CCFW's grant draw down requests are contrary to their own regulations.

C. **Defendants' Treatment of CCFW Is Arbitrary and Capricious**

Not only are Defendants' actions belied by their own regulations; they defy rational explanation and are therefore "arbitrary and capricious." Defendants cannot claim to engage in "reasoned decision-making" when they premised their February 3 Directive on a state grand jury investigation—in another state, investigating a different program—that *on its first page* emphasized that it found no problems with, and only praise for, the refugee resettlement program. As discussed above, a "minimum rationality standard" is missing entirely from this asserted justification, *see, e.g., Sierra Club v. EPA*, 353 F.3d 976, 978 (D.C. Cir. 2004); indeed, given the context above, it appears demonstrably pretextual. Even if one were to consider crediting the Defendants' bizarre rationale for their "pause," Defendants offer no justification, as indeed there is none, for the six weeks that have now elapsed during their purported "review"—particularly when (i) Defendants' own PMS system reflects repeated entries by the PMS staff that CCFW's draw down requests were "Ok to pay" and that "ACF has approved this request" and (ii) CCFW submitted just 22 PDF pages and 4 Excel spreadsheets to ACF over a month ago—documents that should take officials hours—not weeks—to review; never mind that no "review" of such payment documents could address the eligibility concerns the February 3 Directive purported to address, because, as described in CCFW's Complaint, neither CCFW nor HHS have responsibility for eligibility determinations under the Refugee Act statute.

As was also the case in the *Nat'l Council of Nonprofits* case, the government here ignored CCFW's significant reliance interests. CCFW challenges the pausing of already obligated funds—and has demonstrated that it, and its partner agencies, need consistent disbursements of

funds to retain staff members, keep their doors open, and provide necessary services to tens of thousands of families and individuals. When an agency suddenly changes course, it must recognize "that longstanding policies may have engendered serious reliance interests that must be taken into account." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (internal quotation marks omitted) (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016)). The government here entirely failed to do so, as it has admitted that it offered no notice to CCFW (or other impacted grantees) that a Secretarial Directive was implemented for the purpose of pausing payments. Defendants' Opposition ignores their own admissions that the Secretary failed to provide notice to impacted grantees, such as CCFW.

### D. CCFW's Alleged "Delay" in Filing Resulted Solely From Defendants' Conduct

Without acknowledging their lack of notice to CCFW relating to the Secretarial Directive's decision to pause payments for the purported payment integrity review, Defendants claim that CCFW cannot demonstrate irreparable harm because "it waited over a month before seeking emergency relief." ( Govt Opp. Br. at 14.) But the *actual* record reflects Defendants' own admission of lack of notice to CCFW, coupled with CCFW's repeated attempts to seek information from the Defendants regarding the status of the draw downs—requests that went completely unanswered until the filings in this case. *See* Compl. & TRO Motion; *see* Demers Declaration (Dkt. No. 9-2.) Far from demonstrating that CCFW delayed in seeking relief, CCFW's conduct underscores that it aggressively sought answers, while, at the same time, the government was blocking all of CCFW's efforts to discover the source of the funding freeze. Even if this court were to find, despite those facts, that CCFW could have filed for emergency

relief on a more expedited basis, delay is not a dispositive factor whether irreparable harm exists. *Texas Children's Hospital v. Burwell*, 76 F.Supp.3d 224, 245 (D.D.C. 2014).[4]

### E. There is No Basis for Requiring CCFW to Post a Bond

Finally, this Court, among others, has rejected Defendants' requests for APA plaintiffs to post a bond under Fed. R. Civ. P. 65(c) during the pendency of the Court's Order. *See, e.g., Nat'l Council of Nonprofits,* (Dkt. No. 51, Feb. 25, 2025) (holding that a bond "is not necessary where requiring [one] would have the effect of denying the plaintiffs their right to judicial review of administrative action."); *see also NRDC v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) (collecting cases); *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-CV-333, 2025 WL 573764, at *29 (D. Md. Feb. 21, 2025) (setting a nominal bond of zero dollars because granting the defendants' request "would essentially forestall [the] [p]laintiffs' access to judicial review").

The typical process of paying advance payments to grantees, *see supra*, renders the prospect of a bond specifically inapplicable in this instance. The grants payment process operates whereby funding is advanced to grantees (like CCFW) based on a good faith representation that

---

[4] The cases cited by the government on this issue of "delay" are all distinguishable, because the plaintiffs in those cases had requisite notice—the same notice that CCFW was never given—and still waited to file suit and seek emergency relief. *See Pub. Citizen Health Rsch. Grp. v. Acosta*, 363 F. Supp. 3d 1, 22 (D.D.C. 2018) (finding no irreparable harm where plaintiffs had express notice of the government's complained-of action, yet waited over three months after learning of it to seek preliminary relief) *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005) (delay found to be "unexcused" when serial litigant who had knowledge of inauguration policy relating to prayers by clergy based on attending prior inaugurations filed suit close to inauguration day); *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) (finding that a delay of forty-four days after final regulations were issued was "inexcusable" expressly because plaintiffs had notice far earlier of when the public comment was set to end); *Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*, 840 F. Supp. 2d 327, 338 (D.D.C. 2012) (determining that the bank's public press releases should have placed plaintiffs on notice as to the bank's commitments years before the plaintiff sought injunctive relief).

the funds are going to be used to quickly pay allowable costs, all subject to audit. Given these circumstances, it would be highly unnecessary for grantees such as CCFW to be asked to back up their drawdowns via a bond.

## CONCLUSION

For all of the foregoing reasons, CCFW respectfully requests that this Court grant its motion and enter a temporary restraining order that would enjoin Defendants from continuing to freeze CCFW's funding. CCFW further requests that this Court order that Defendants pay CCFW's lawful draw down requests, which approximated $36 million as of February 26, 2025 but has since increased to $42 million as of March 4, 2025. *See* Notice of Suppl. Decl., Dkt. Nos. 14 and 14-1 (Mar. 6, 2025).

Dated: March 10, 2025

          Respectfully submitted,

          __/s/ Edward T. Waters_____

          **Feldesman Leifer LLP**
          Edward T. Waters (D.C. Bar No. 422461)
          ewaters@feldesman.com
          Mindy B. Pava (D.C. Bar No. 995328)
          mpava@feldesman.com
          Stephen Kuperberg (D.C. Bar No. 462992)
          skuperberg@feldesan.com
          1129 20th Street NW, 4th Floor
          Washington, DC 20036
          (*t*) (202) 466-8960

          ***Attorneys for Plaintiff Catholic Charities, Diocese of Fort Worth, Inc.***

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CATHOLIC CHARITIES,<br>DIOCESE OF FORT WORTH, INC.,<br><br>*Plaintiff*,<br><br>v.<br><br>U.S. DEPARTMENT OF HEALTH AND<br>HUMAN SERVICES, *et al.*,<br><br>*Defendants*. | Civil No. 1:25-cv-605 (LLA) |

CERTIFICATE OF SERVICE

I certify that, on this 10th day of March 2025, I served this Reply upon Joseph F. Carilli, Jr., counsel for Defendants, via the Court's Electronic Court Filing system (ECF).

/s/ Edward T. Waters