Exhibit 1

#93

# IN THE SUPREME COURT OF FLORIDA

CASE NO.: SC22-796

# THIRD PRESENTMENT OF THE TWENTY-FIRST STATEWIDE GRAND JURY REGARDING UNACCOMPANIED ALIEN CHILDREN (UAC)

FLORIDA SUPREME COURT

03/29/2023

RECEIVED

We, the members of the Twenty-First Statewide Grand Jury, are a group of Florida residents who come from varied backgrounds; we are educators, retirees, veterans, businesspeople, and homemakers. Some of us were born or have lived extensively overseas. We have children of our own and care for children of others. We have been investigating the questions presented by the Florida Supreme Court's Order establishing this Statewide Grand Jury, have issued two reports already and anticipate more to come. This Presentment touches on an issue of singular importance to us all: the process whereby Unaccompanied Alien Children (UAC) are brought into our State and, in too many cases, left to an uncertain fate.[1]

If one reads no further, we hope this will make our findings clear:

If any resident of Florida exposed U.S.-born children to this process, they would be justifiably arrested for child neglect or worse. We do not think children should be less-protected simply because they were born outside our borders and brought here by a government agency.

UAC[2] are defined under federal law as individuals under the age of 18 with no lawful U.S. status and no parents able to provide care and take physical custody

---

[1] We focus herein on the treatment of UAC only; though similarly situated, Unaccompanied **_Refugee_** minors undergo a different process and have a different legal situation; accordingly, they are not the subject of our discussions herein. We further commend organizations such as Lantern Rescue for their important work in identifying and assisting actual refugee populations. Finally, like the federal courts, we "use the term "alien" because that is the term used by Congress in the immigration laws. See 8 U.S.C. §1101(a)(3)." State of Florida v. United States of America, et.al, Case No. 3:21-cv-1066-TKW-ZCB (N.D. FL, March 8, 2023).

[2] We have received a great deal of evidence regarding the importation and behavior of **_adult_** aliens as well, and have followed with interest the proceedings in State of Florida v. United States of America, et.al, Case No. 3:21-cv-1066-TKW-ZCB (N.D. FL, March 8, 2023). We would be remiss in failing to note that, unfortunately, the population of those seeking entry into this country contains both "good and bad apples" just as our native population does. We received gut-

when they are encountered. They are required to be initially screened by the U.S. Border Patrol and within 72 hours referred to the custody of the Department of Health and Human Services' Office of Refugee Resettlement (HHS/ORR).

Recent years have seen a massive increase in referrals from Border Patrol and the Department of Homeland Security. According to the data published by ORR (which is, if anything, an undercount), it had approximately 3,700 children in its care at the end of calendar year 2020. By the end of March 31, 2021, that number had tripled to approximately 10,500. By April and May 2021, it had nearly doubled again to over 20,000. Since March 2021, HHS has consistently had, on average, 11,000 children in its care *each month*. For FY 2015, a total of 27,340 UAC were released into the custody of sponsors in this country. *In FY 2022, that number was 127,447, nearly a five-fold increase—and 13,195 of them were released in Florida.* Since November 2022, more than 30,000 additional children have been released. Seventy-two percent (72%) of these minors are ages 15-17. Only 16% were under the age of 13.

Like many of our fellow Floridians, we had no pre-existing knowledge about how UAC are processed, how their sponsors are selected, how they arrive in Florida, and how they are cared for upon arrival. The public is led to believe that the process described by our federal government in documents and popular media accounts at least resembled the truth. ORR asserts that children fleeing from danger are adequately identified, properly cared for, and reunited with their family here in this country.

In reality, ORR is facilitating the forced migration, sale, and abuse of foreign children, and some of our fellow Florida residents are (in some cases unwittingly) funding and incentivizing it for primarily economic reasons. These entities encourage UAC to undertake and/or be subjected to a harrowing trek to our border, ultimately abandoning significant numbers of those who survive the journey to an uncertain fate with persons who are largely unvetted. This process exposes children to horrifying health conditions, constant criminal threat, labor and sex trafficking, robbery, rape, and other experiences not done justice by mere words. We will never be able to forget or un-see some of the heart-wrenching testimony, disturbing videos,

---

wrenching testimony, for example regarding brutal and horrific murders committed against civilian tourists, law enforcement officers, and even sponsors of immigrants, by those who had no legal right to be in the country in the first place, and about the significant cost to our State due to the unlawful presence of such individuals and the resources which must be diverted to deal with them.

and infuriating abuse we have observed in the course of our five-month investigation.

In 2014, then-Vice President Biden warned that between 75 and 80 percent of unaccompanied alien children are brought into the United States by smugglers, many of whom "routinely engage in physical and sexual abuse, and extortion . . . ." Those here in Florida who are sending money and other aid to facilitate this process should know what it is they are funding. At nearly every juncture, travelers forging the Darien Gap and other notorious routes must pay handlers, armed militia groups, native tribes, local warlords, gangs, or drug cartels hoping to obtain safe passage. In many cases the toll is exacted in lives, labor, or sexual abuse. They face disease, famine, drought, a perilous jungle trek, insects, and predators both human and animal. As recently as March 5th of this year, Mexican police rescued 343 migrants along the Cosamaloapan-LaTinaja highway-- 343 people crammed into the back of a semitruck which was found abandoned with no driver. Some of those (28) were families, 212 single travelers, and **103 were unaccompanied children**, most from Guatemala, wearing colored bracelets as a means of identification so their smugglers could sort them by who had paid and where they were going. These rescued UAC were the lucky ones. In June 2022, more than 50 persons died trapped in sweltering conditions in an abandoned tractor-trailer in San Antonio, Texas; in December 2021, 55 more died when the truck in which they were traveling crashed in Chiapas, Mexico.

The Florida Department of Children and Families (DCF) published a survey in July, 2022, in which they interviewed 49 UAC (of the more than 13,000 brought in that year) in just two Florida placements. They stated:

> The children interviewed knew very little about the individuals that transported them during their journey to the border . . . [and] disclosed that the individuals who transported them were "Coyotes." One child disclosed that during her journey several members of her group were robbed, attacked by gang members, decapitated, and raped. The child disclosed that she was one of the victims of rape.

Those who provide financial incentives or support by sending money to a coyote or some anonymous handler in a foreign locale thus incentivize putting children through this hellish experience and are contributors to the abuse that occurs as a result. We are working with our partners in the financial world and FDLE to identify them and expose any complicity in criminal human trafficking activity.

3

As was pointed out in 2017 Congressional testimony by Kevin McAleenan, then-Acting Commissioner of U.S. Customs and Border Protection:

> [W]e have an obligation to ensure that those who conspire to violate our immigration laws do not do so with impunity—particularly in light of the unique vulnerabilities of alien children who are smuggled and trafficked into the United States. The parents and family members of these children, who are often illegally present in the United States, often pay smugglers several thousand dollars to bring their children into this country. Tragically, many of these children fall victim to robbery, extortion, kidnapping, sexual assault, and other crimes of violence by the smugglers and other criminal elements along the dangerous journey through Mexico to the United States. ***Regardless of the desires for family reunification, or conditions in other countries, the smuggling or trafficking of alien children is intolerable***. (Emphasis supplied).

Regrettably, the problem has gotten worse, not better, in the years since that testimony was given. In addition, the process of identifying UAC and their sponsors creates multiple perverse incentives and tragic outcomes. Some "children" are not children at all, but full-grown predatory adults; some are already gang members or criminal actors; others are coerced into prostitution or sexual slavery; some are recycled to be used as human visas by criminal organizations; some are consigned to relatives who funnel them into sweatshops to pay off the debt accumulated by their trek to this country; some flee their sponsors and return to their country of origin; some are abandoned by their so-called families and become wards of the dependency system, the criminal justice system, or disappear altogether. Meanwhile, ORR's efforts and resources are less-directed at preventing or remedying any of these maladies, and instead appear fully focused on maximizing the number of children they can process, heedless of the downstream consequences to either the children or the communities into which they are jettisoned.

ORR—armed with a budget of billions of taxpayer dollars and working with activists and nonprofit organizations[3] which receive hundreds of millions of dollars in grant monies, hold millions in assets, and pay cadres of executives salaries in the hundreds of thousands of dollars-- is handling thousands of foreign children in a dangerous manner.

---

[3] We intentionally do not identify these organizations in this Presentment; we fully intend to do so at a later time.

We spent more than five months questioning, learning, listening, reviewing, reading, and discussing dozens of witnesses, streams of video, gigabytes of data, and reams of paper.  We have received first-hand testimony and supporting documents in ample quantities justifying these conclusions.  Many of the facts we have learned are depressing to contemplate and provoke a great deal of outrage.  Yet "in the long run, the most unpleasant truth is a safer companion than a pleasant falsehood."[4]

We understand that one of the typical defenses of this process is that only a small number of children fall prey to any of these misfortunes.  To that we say two things: (1) this is a false trope, presented either by those who are utterly ignorant of reality or those who would see the current conditions continue- the number and percentage of UAC experiencing problematic scenarios is ***not*** small by any stretch; and (2) ***even one*** such easily preventable case ***is unacceptable***.

I.    The Process

UAC who arrive at a border (as more than 250,000 have since January, 2021) are initially met by a Border Patrol agent and screened to determine their identity, origin, and physical well-being.  All of this information is self-reported; some are carrying documents, but most are not, and even those documents are not always authentic.  UAC are ***not*** rapid-DNA or biometric tested to see if, in fact, they might be an adult with a criminal history or if they are truly biologically related to either their putative parent or a proposed sponsor. DHS does not cross reference the UC portal—HHS's case management system and official system of record for unaccompanied alien children (to determine, for example, if the UAC has been here before).

Federal law requires that within 72 hours custody of UAC must be turned over to ORR, which then houses the UAC for a period of twenty days or less.  They do so in shelters in 22 states; some are designed for this purpose, some are "Emergency shelters" built or converted for this purpose and staffed on a contract basis, and some are shelters run by organizations we have previously referenced (in Florida, these facilities have historically been required to be licensed as "Child Placement Facilities" by the Florida Department of Children and Families).  Some such shelters run three shifts of hundreds of "case managers" each, 24 hours a day.

ORR divides the country into three regions and uses "Federal Field Specialists" to oversee and manage the care provider facilities and releases of

---

[4] Theodore Roosevelt.

children to sponsors. An Intake Team reviews available bed space at ORR care providers or temporary facilities through the UC Portal. According to an employee of one care provider, the Intake Team provides "very minimal demographic information" when attempting to identify initial placement, in one instance only asking the care provider if it had "space for a 12-year-old boy from Guatemala."

The UAC is then shipped off to a facility to await placement pending a decision on their claim to remain in the country.[5] Questions are asked about the child's journey, family and significant relationships, and a child's medical, legal, and educational background.

Case managers theoretically determine whether the child requires services such as medical or psychological treatment, and whether they have a sponsor awaiting them in this country. Case managers are not required to have more than a bachelor's degree, and none we spoke with either had themselves or knew of any others with any law enforcement experience. Indeed, several we met with were hired over the phone, sight unseen, after a brief conversation and at most a cursory background check. Unless the case manager comes to the job with prior experience, they receive little to no training in such things as:

-interviewing individuals, especially these children, in a trauma-informed manner;

-examining, evaluating, or recognizing documents as authentic or fake;

-investigating the safety or legitimacy of addresses to which the UAC might be sent;

-conducting checks for criminal history;

-conducting fingerprint checks or interpreting results;

-recognizing gang affiliation.

They are actively discouraged from independently investigating any of these things, and in some cases directly ordered not to do so. Many case managers learn how to do their jobs largely by trial and error or discussions among one another. They ascertain whether ORR's UAC portal database shows that anyone has applied

---

[5]Fortunate UAC arrive at a smaller-scale facility where their cases receive more thorough assessment with a manager-UAC ratio perhaps as low as 8-1. Others end up in overcrowded, hastily-erected converted shelters with ratios approaching 30-1.

to sponsor the UAC, and if so where that person might be and whether they claim to be a parent, a relative, or unrelated to the UAC (Categories of sponsors). Case manager supervisors are sometimes just those who have managed to stay around the longest—some were promoted after as little as a few weeks.

Often, inconsistencies emerge in the UAC's story, or in comparing the UAC's version to that of a potential sponsor. We received testimony that at some facilities, even when case managers discovered and attempted to pursue this, they are chastised by their superiors at ORR and reminded that they are ***not*** to investigate suspicions, or question documents or addresses. They are told they are "not experts" and that their job is to approve placement with a sponsor.

We learned of the incessant pressure on case managers to process UAC speedily with minimal, if any, scrutiny of sponsors or questionable documents, addresses, or stories told to them. Thirty-day timeframes for processing a UAC are often reduced to twenty, and to as few as fourteen.

## II.    What Are They Hiding?

We issued subpoenas and requests for documents and information to several Florida organizations doing business with ORR. We took care ***not*** to request any information about UAC themselves (including their identities or points of origin). We received, instead, a response from the organizations that they would be purposely ignoring some of those requests under orders from ORR,[6] with whom they have a contractual relationship. The organizations and their officers likewise refused in-person demands for information.

In testimony before us, one CEO admitted only visiting the UAC facility run by that organization one day per month. Officers professed to be unable to discuss the details of their acknowledged transfer of minor children, on the theory that subpoenas and direct questions from the Supreme Court of Florida and this grand

---

[6] ORR and the organizations cited three authorities:

    a) 44 U.S.C. Sec. 3301 (part of the Federal Records Act). This statute defines and governs "Disposal" of records. It says nothing whatsoever about disclosing them or complying with subpoenas;

    b) 5 U.S.C. 552a / SORN #09-80-0321. This is the Privacy Act, which again makes no reference to compliance with subpoenas and specifically applies only to records of "a citizen of the United States or an alien lawfully admitted for permanent residence"—we asked for records of neither);

    c) 81 Fed.Reg. 46682-46683, which is not a statute but instead an ORR bureaucratic rule.

jury were subservient to the language of the contract they chose to sign with ORR in exchange for massive amounts of federal taxpayer dollars. Indeed, part of one response asserted that it was "*beyond the authority of the Statewide Grand Jury*" to even so much as ask for "the total number of sponsors who have received more than one UAC for placement."

Some executives were cooperative to an extent, but nonetheless displayed an alarming lack of awareness that there were any serious problems in the current process. Extreme naivete can be as dangerous as malice in this situation.

Others behaved far more suspiciously. On ***ninety-three*** separate occasions during examination of one group, the answer was some variant of "I don't know"; they don't know who makes placement decisions, they don't know who redacted entire emails including signature lines, they don't know what a follow-up to placement is, they don't know anything about ORR's success or lack thereof in safe placement, they don't know why they don't report crimes they observe, they don't know what happens to children after leaving their facility, the CEO doesn't know the answer but says another officer does but that officer has no idea why the CEO would say that, and on and on *ad nauseum*.

Uniformly, these individuals professed allegiance to ORR. They were unable to name ***any*** condition which ORR might put upon a grant which would lead them not to accept the money. We confronted them with a number of the findings about ORR referenced in this report; we pointed out that they could easily choose to provide ***care*** to UAC without becoming involved in ORR's ***placement*** business; yet the answers did not change. These organizations would (as one CEO brazenly stated) rather operate an unlicensed placement facility and display contempt of Florida's laws, than risk losing ORR's funding.[7]

We requested (but ***intentionally*** did not try to compel) the presence of ORR's nominal leader at one of our sessions; that request was refused by an Assistant Secretary for the Administration for Children and Families:

> Your request also fails to state "the reasons why the testimony would be in the interest of the DHHS or the federal government...."***an agency's choice of whether or not to comply with a third-party subpoena is essentially a policy***

---

[7] Last December, four Members of Congress wrote a letter to one such organization, complaining that "***NGOs continue to profit off of exploiting our immigration laws***." The organization proceeded to publicly call the Congress members "fallacious and factually inaccurate." We believe this Presentment and their IRS Form 990 filings show the contrary.

*decision* about the best use of the agency's resources."… Compliance with your request *[to send a single person to discuss matters for a few hours— probably less time than it took to write the "response"]* would **disrupt ORR's mission** to provide people in need with critical resources to assist their integration into American society **and would interfere with ORR's carrying out statutorily mandated responsibilities** under the DHHS program authorities. As you know, the subpoena does not arise out of any litigation to which ORR is a party, and *you have not articulated why [the witness]'s testimony would be in the interest of DHHS or the federal government (Emphasis supplied).*

Indeed, it appears that exposure of these activities is not in *their* interest whatsoever, but that returns us to our original question: *What is this agency hiding from the American people* that it would make a "policy decision" that a simple request for the relatively brief testimony of one individual is so dangerous that it would "disrupt its mission"? The Order directing our empanelment contains a mandate to investigate; to do that, we ask for information—information ORR refuses to supply.

This culture of aversion to transparency appears to be endemic. In an October 28, 2021, report prophetically titled *Exposing the Risks of Deliberate Ignorance: Years of Mismanagement and Lack of Oversight by the Office of Refugee Resettlement, Leading to Abuses and Substandard Care of Unaccompanied Alien Children* the United States Senate Committee on Finance noted:

At the beginning of this investigation, the Committee submitted what it considered to be straightforward requests for easily accessible information. Instead of providing this information, HHS slow-walked productions and eventually provided the information in unusable or difficult-to-use formats, causing unacceptable and obstructive delays. HHS first refused to provide any documents in a digital format and then provided several boxes of printed and unorganized, mostly irrelevant, documents. The documents found to be potentially relevant were, without exception, incomplete. HHS also redacted vital tracking numbers from the hard copy documents, meaning that staff were unable to link related SIRs [Significant Incident Reports] together, or to link SIRs to any other ORR response. The document production also inexplicably included, without context, several hundred printed pages of the Code of Federal Regulations— publicly available information that is already

accessible online in an electronic format. It is standard practice that recipients of congressional information requests, including federal agencies, provide documents to Congress in the most usable format for review available or, at the very least, in the format used by the agency. ***It is the position of both offices [Democrat and Republican] that these obstruction tactics ... fundamentally interfered with Congress's Constitutional duty to conduct oversight and caused undue delays (Emphasis supplied)***.

We stand in company with the United States Senate and House members in being actively obstructed by this agency.

This obfuscation extends beyond just ORR in the immigration context. Last March, NBC News reported that Border Patrol agents and officials, who had previously been responding to public record and media inquiries about the number of border apprehensions and conditions (including releasing videos), were subjected to a gag order prohibiting any media requests or sharing data on their own. We also learned that ORR actively discouraged its employees, including case managers and those tasked with conducting sponsor verifications, UAC interviews and post-release followup, and fingerprint and background checks, from questioning the process even internally; some were transferred, some terminated, some threatened, and some smeared simply for not processing the UAC as quickly as possible. One was fired for reporting a case of suspected human trafficking (of over 100 UAC shipped off to a single house in Texas) to a government hotline because her ORR superiors refused to investigate the matter. One facility went so far as to set up a "reporting station" for employees to bring their concerns to; it was purported to be staffed with FBI agents, but was later learned to have simply other ORR employees—the agency was reporting itself, to itself. In one memorable instance, a federal employee was told by an ORR attorney to stop asking questions about potentially unsafe sponsors because doing so caused delay, and

> *"[W]e only get sued for keeping them too long.*
>
> *We don't get sued by traffickers. Are we clear?"*

We learned that the very clandestine nature of ORR's process was what first attracted the attention of some in our state; during a six-month period in 2021, more than 70 airplanes (large commercial passenger jets) landed at the international airport in Jacksonville, Florida. These flights arrived in the night time often after midnight, and landed not at the passenger terminal, but instead at an out-of-the-way commercial terminal used normally for shipping freight, away from police facilities

and miles from the passenger terminal. The companies charged with fueling and offloading the cargo received last-minute notice of the flights, necessitating scrambling for workers to be available. Airport police received very little notice that the flights were arriving, where they were from, or who was aboard (and as our investigation progressed, this information dwindled to zero). The airliners were met by private buses or other coach services, who also received only last-minute notice of the number of passengers they would be serving and the destinations to which they were going. If an operation were ferrying terrorists or large quantities of narcotics, this is what it would look like.

Two Senators and thirteen U.S. Representatives from Florida wrote letters to DHS demanding to know what was going on when airplanes full of children were landing in Jacksonville in the middle of the night; they got no cooperation. As it turned out, the flights were full of UAC. The children would exit the aircraft in this extremely unsecure environment, collect various color-coded luggage, and eventually board the buses/SUVs. Many of them carried envelopes containing paper and a cell phone; most were older teenagers. The buses would then proceed to various points; some drove north out of Florida, while others made several stops at which some of the children would exit. These stops turned out to be facilities managed by the organizations described above. Sometimes, individual children would get off the bus in a parking lot and get into a private vehicle. One of these individuals was a 24-year-old male (erroneously vetted as a child by ORR and placed onto a plane full of other children) who was delivered to his sponsor (a man who claimed falsely to be this person's uncle in another vetting failure) in Jacksonville. The fake UAC proceeded to violently murder the sponsor, who was a businessman living here in Florida for years, by stabbing him more than 50 times and bludgeoning him with a chair. We wish this were the only such case which we have learned about; it is not, but it does serve as a perfect illustration of the completely foreseeable tragic outcomes which occur as a result of this type of activity.

When investigators attempted to learn more about these goings-on, they were met with locked gates and letters from lawyers. As our investigation intensified, and we started issuing subpoenas and making inquiries, the flights stopped. We have since learned, though, that ORR now simply conceals small groups of UAC on regular commercial flights and conducts their operations in piecemeal fashion; instead of large planes populated solely with hundreds of UAC, now groups of five or so ride along with everyday travelers on commercial flights and then get picked up in smaller vehicles. It is disheartening that the response to legitimate inquiry has

been to double down on efforts at concealment, but that has proven to be a theme in this investigation.

Nonetheless, with the help of diligent work by FDLE, FHP, the Florida Sheriff's Association and other investigators and courageous cooperation and testimony from dozens of witnesses and whistleblowers to whom our investigation owes much gratitude (including current and former federal and state government employees and law enforcement agents, current and former employees of federal contractors, current and former employees of these nonprofit organizations, immigrants, and subject-matter experts from both public and private sectors), we have more than enough information to understand what is actually going on and will continue nonetheless.

### III.  Follow the Money

The smuggling of human beings including children into this country through our southern border has been characterized as "a multi-billion-dollar international business controlled by organized crime" since at least 2015, when the New York Times gave this description in a report about the 5,064 federal arrests for human smuggling in a single year.  We received testimony and evidence that much of the instigation and funding of these international treks emanates from within our borders, both state and national.  Examination of financial transactions[8] from just a few institutions shows transactions that can only be described as mysterious: for example, Florida residents with no known or apparent connection to obscure cities in Guatemala or Mexico make regular wire transfers to that city, or to multiple points nearby, for a period of one month, then stop; individuals in a border town collect payments from multiple Florida residents who share a nationality with each other, but not the receiver, and other similar discrepancies.

The testimony we have received corroborates this clear pattern; people here send funds to facilitate the migration of others to the border, and in so doing some of them are (wittingly or otherwise) funding trafficking operations, gangs, cartels, and other unsavory characters.  Some of the people sending these funds are not citizens, but themselves are recent arrivals or even UAC who have aged out of ORR custody.  Many are awaiting disposition (with an average delay approaching five years amid a backlog of hundreds of thousands of cases) of an asylum claim they have a 90% chance of losing (because so few have merit, according to several of our

---

[8] We took pains to examine only a small portion of transactions which occur, intentionally excluding those which might fairly fit commercial transactions or simple "remittance" payments.

witnesses, including an immigration defense attorney and a former Director of ICE). However, while here, these individuals are eligible for work visas and various government benefits, with some of the proceeds being used to facilitate the next group of travelers in the cycle.[9]

Equally disturbing, nonprofit organizations here in this country are granted hundreds of millions of dollars directly from ORR.[10]  We received testimony that at least one grant, involving approximately one hundred million dollars, was awarded in "single-source" fashion to address the emergency of the crushing increase of UAC reporting to our southern border.  The irony of this is not lost on us; rather than these agencies adopting policies to decrease the number of children making this dangerous journey, the process is turbocharged to squeeze more children through this pipeline. More locally, organizations in Florida have over the past decade collectively received more than 300 million dollars in federal grant monies related to the UAC activities.

The United States Senate likewise observed this phenomenon; in an October 28, 2021 Senate Committee on Finance Investigative Report, it noted that (in addition to many other failings on the part of ORR to adequately safeguard the children in its care) "investigative reports show that the owners and operators of large networks of grantee facilities may have engaged in questionable financial practices, such as self-dealing and excessive salaries for personal gain." The United States Senate's Committee on Homeland Security and Governmental Affairs Permanent Subcommittee on Investigations also examined HHS's processes for funding and opening children shelter facilities. HHS gave two companies $32 million in grants to operate shelter facilities that never opened.  Those observations are consistent with our own.

IV. <u>Who are the Children</u>?

In far too many instances, no one seems to really know.  When a UAC presents at the border without parents, Border Patrol is required to refer the UAC to the

---

[9] This represents an optimistic view; what also happens, we have learned, is that cartels and other criminal organizations take advantage of these circumstances to coerce immigrants to bring drugs (most popular recently, fentanyl), other items of contraband, or even terrorists and gang members disguised as family members across the border with them in exchange for permitting the immigrants to traverse their territory and receive funds being sent to them for that purpose.  As one witness put it, "if you can get a human across, you can get anything across."

[10] In fiscal year 2021, **$2.14 billion** was transferred to the unaccompanied minor program within HHS, according to the agency's website.

custody of ORR. However, at that juncture, Border Patrol has no ability to verify that (a) the child is who they claim to be, or (b) that they are in fact a "child" (in some cases, this is obvious; however, around 40% of UAC are age 17 or above, making it difficult in many cases to visually verify any claims about age). We received testimony and visually inspected many forms of identification discarded on the Mexico side of our southern border; those who present themselves abandon these documents by the truckload. According to what we have learned, this is often so that the individual is not exposed by having his or her real ID on their person and can instead claim to be whomever they wish.

In any event, with ***more than a quarter million*** purported UAC presenting themselves in just the past two fiscal years, Border Patrol agents have little recourse; they turn the individuals over to ORR. Unfortunately, in many cases this is the last point in the process where at least the agency in charge has real knowledge of who is taking custody of many of these children.

Not all UAC are fit for placement with other children. We note first that, even if Border Patrol agents were permitted to fingerprint or otherwise firmly identify the UAC, they have no way of accessing any criminal history which occurred outside of the United States.

We have already referenced the case of a 24-year-old murderer who finagled his way through the UAC system (where *he spent weeks in the company of other UAC*) to kill his Florida sponsor. The killer's Honduran mother was interviewed by a Spanish-language television reporter; she reported that he called to tell her that he had entered the U.S. fraudulently because "right there at the shelter they helped me." The killer was referring to financial and other assistance rendered by some of the same charitable organizations while he was still in Mexico, and then again once he crossed the border. He presented clearly fraudulent documents to his case manager, which went either ignored or undetected.

We received testimony and saw photographs and other evidence regarding other adults masquerading as UACs, including men and women ranging in age from 27 to 37. HHS discovered 105 children the agency later determined were actually adults during fiscal year 2021 alone, according to its own website. Often, the adults will have fake documents showing their age as a minor. In just the month of August, 2022, El Paso Border Patrol agents arrested seven adults aged from 19 to 26 who tried to pass as children; agents in that region have discovered more than 665 adult

illegal aliens who tried to pose as unaccompanied minors to gain expedited entry into the United States in the past 12 months.

We reviewed evidence about UAC who, while they were in fact minors, presented phony documentation and fraudulent claims in an effort to enter the country. Yet none of these cases resulted in a report to ICE or any other law enforcement authority, even to investigate the source of the documents. Each incident is a separate federal criminal offense. Instead, the people who discovered them were ordered to report the matter to their cohorts in ORR (sometimes they were effectively misled that they were reporting to the FBI, when in fact they were not). More incredibly, the adults posing as children were simply taken out of the facility and released, as one manager put it, "into the wild"; the minors were permitted to submit other documents, supposedly more legitimate than the first set.

According to the testimony of the Border Patrol's acting chief, even as far back as 2017 it was known that at least 59 UAC had been identified as members of the MS-13 gang. That number has increased significantly; we received testimony that other gangs likewise send members and even have UAC members graduate to adulthood and apply to sponsor other UAC members. Entire separate facilities were required at some ORR shelters to house those UAC who were flashing gang signs, engaging in fights, and making threats due to gang affiliation.

Further, ORR has repeatedly failed to keep UAC safe from one another or even facility staff members. ORR monitors its facilities' abilities to ensure the safety and well-being of children in ORR's care in multiple ways, including reviewing significant incident reports (SIRs). When incidents of a serious or severe nature occur at ORR-funded facilities, facility staff are required to submit SIRs. Incidents that require staff to submit SIRs can range from verbal threats to allegations of sexual assault between children in care or between staff and children.

In February 2019, Axios reported on internal documents received by Congress that showed HHS and the Department of Justice (DOJ) received thousands of allegations of sexual abuse, including almost two hundred staff-on-child allegations. A 2018 Report by the HHS Office of Inspector General:

> reviewed incident reports that 45 care provider facilities submitted to ORR between January 1, 2018, and July 31, 2018. Among these reports, 761 unique incidents described conduct of a sexual nature. Reports for most (704) of these incidents involved conduct between minors, fewer (48) involved conduct by an adult against a minor, and the remaining (9) incidents had an unknown

perpetrator. … incident reporting system lacks designated fields to capture information that ORR can use to oversee facilities and to protect the minors in ORR care. Important information about facilities' actions are not systematically collected to help ORR determine whether facilities responded appropriately to incidents. In addition, the system does not effectively capture information in a way that allows for efficient identification of issues that require immediate attention and analysis to detect concerning trends. Further, facilities described challenges with staffing youth care workers— who are essential to preventing, detecting, and reporting incidents—and difficulties determining which incidents should be reported to ORR.

Case managers reported to us that not only was this accurate then, the situation has worsened. Significant Incident Reports continue to be underutilized, poorly tracked, and short on information. We also note that many of the charitable organizations we mentioned previously submitted formal complaints, captured in a report published by the Office of Management and Budget, essentially arguing that the mere existence of Significant Incident Reports was so detrimental to the possible immigration or legal status *of the perpetrators*, that the reports should be either dramatically revised to include almost no relevant information, or ***done away with altogether***.

We set forth these unpleasant details, not to suggest that UAC are mostly undesirables; indeed, the majority certainly are not. Rather, we use these incidents to illustrate the utter failure of any of these custodians to truly know, or even make any genuine effort to know, with whom they are dealing. As long as UAC—and, more concerningly as explained below, their sponsors— are not subjected to even minimally competent identification procedures, but instead rushed through the placement process and effectively abandoned thirty days later, completely preventable tragedies will continue.

## V. Where are They Going and With Whom?

Again, we have learned that the answer in many cases is, "nobody really knows." As we previously noted, many of the sponsors are recent arrivals themselves and, as found by the Florida v. United States court (*supra*):

Although DHS says it is screening arriving aliens released on Parole+ATD to determine if they are a public safety threat, the more persuasive evidence establishes that DHS cannot reliably make that determination. Indeed, according to Defendants own witnesses, DHS has no way to determine if an

16

alien has a criminal history in his home country unless that country reports the information to the U.S. government or the alien self-reports. Therefore, DHS is mainly only screening aliens at the border to determine if they have previously committed a crime in the United States, and because many of these aliens are coming to the United States for the first time, DHS has no idea whether they have criminal histories or not.

After arrival at a care facility, ORR aims to release each unaccompanied alien child to a sponsor—a parent, guardian, relative, or other individual. ORR developed five categories of potential sponsors; more than 95% of cases fall into the first three categories. ORR prioritizes the release of unaccompanied alien children to a parent or legal guardian ("Category 1" Sponsors) but places some 50 percent of unaccompanied alien children with other relatives ("Category 2" Sponsors)-- extended family, some of whom have never met the child before placement.

According to the Department of Health and Human Services, ORR placed **262,159** unaccompanied alien children with sponsors from January 1, 2020 to December 7, 2022. ***Nearly two-thirds of UAC were placed with someone other than a parent.***

According to ORR, approximately 36% of UAC are placed with Category 1 and 50% are placed with Category 2 sponsors. However, ORR appears to use the term "immediate relative" exceedingly loosely, including extended family members outside of the nuclear family. The description of categories 2A and 2B in the ORR Policy Guide states "A brother; sister; grandparent or other immediate relatives (e.g., aunt, uncle, first cousin) . . ." But as the Senate subcommittee noted, "the Immigration and Nationality Act itself defines 'immediate relative' of a U.S. citizen as 'the children, spouses, and parents of a citizen of the United States.' Sec. 201(b), 8 U.S.C. § 1151(b)(2)(A)(i). 'The common understanding of '***immediate*** relatives' is the nuclear family and would not include aunts, uncles, first cousins, or grandparents, who are members of the ***extended*** family.'"

Since January 2021, approximately 165,000 UAC nationwide have been given to someone who is not their parent or legal guardian, approximately 90,000 have been turned over to someone claimed to be a family member without DNA testing and without adequate document verification, and about 30,000 have been surrendered to someone to whom they have no known relation. In Florida, using those rates, that means in the past two years at least 1,583 children went to live with such "Category 3" persons, nearly 6,600 went to relatives of unknown familial

proximity, and only 4,750 went to an actual parent—at best. We have learned that a 2022 survey conducted by the Florida Department of Children and Families covering approximately 50 UAC at multiple group shelters revealed only four (***less than ten percent***) of them were being placed with a parent.

A potential sponsor must complete a formal family reunification application and document the identity, address, and relationship to the child they seek to sponsor. According to our witnesses, verification of these materials is suspect:

--most documents are submitted online (sometimes via What'sApp and similar software);

--fingerprint checks are not conducted by federal or state law enforcement, but are contracted to a private vendor (with no ability to determine for example if a sponsor has an active warrant). Only Category 2B and 3 sponsors have their prints sent for an FBI check, and this does not extend to individual state databases. To identify themselves to the examiner (who does not speak to a case manager), sponsors simply show up to one of more than 1,750 machines at various points around the country, where they place their fingers on a glass pad and the prints get sent to yet another remote collection site to be compared to the vendor's records. Sponsors submitting prints can use documents such as a foreign drivers license, a Mexican border crossing card, a "school ID with photo," a "Transportation Worker ID Credential," and other documents whose provenance is rarely ascertainable—meaning that the collector has no true idea who they are actually checking.

--background checks are likewise confined to public records and "backgroundchecks.com," a problematic method of checking. Further, we received ample evidence that such checks are often waived (as far back as 2016, Senator Grassley was criticizing ORR for having waived more than 700 Child Abuse Registry checks for Category 3 Sponsors, and ORR's 2021 Field Guidance #10 and #11 waived checks for others living in the home as well). Criminal history (except for some major offenses), lack of citizen status (ORR prohibits asking, and **does not consider it disqualifying even if a sponsor has been ordered to be deported**), and ***even total refusal to submit to a background check,*** do not disqualify sponsors.

These requirements have also more recently been weakened by ORR in the name of efficiency. In FY 2021, more than 146,000 unaccompanied alien children entered the United States, of whom HHS released 108,246 to sponsors. However,

following changes to ORR's background check policies in March 2021, HHS's completion of background checks decreased significantly. In FY 2021, HHS completed 25,413 digital sites fingerprint checks (23 percent of cases) and 9,885 child abuse and neglect registries (9 percent of cases). In other words, HHS conducted 55 percent fewer digital fingerprint checks and almost 20 percent *__fewer child abuse and neglect registry checks__* on behalf of UAC than in FY 2019.

On March 22, 2021, ORR issued "Field Guidance #10," which diluted these standards further. Now, Category 1 sponsors complete a shortened application to establish proof of relationship and identity and ORR also *__eliminated the proof of address requirement for the potential sponsors, and explicitly exempted other household members from being required to submit identification documents or undergo a background check__*. Translation: Under Field Guidance #10, case managers no longer have any idea who else is living in the residence the UAC shares with the sponsor or what the background of those individuals may be.

On March 31, 2021, ORR continued eviscerating its own "safety protocols" and issued "Field Guidance #11." Under this edict, *__background check requirements (as well as requirements for obtaining identification) for adult household members and alternate adult caregivers identified in a sponsor care plan are not required__* in Category 2 cases unless exceptional warning signs surface. Waiving background check requirements on household members of Category 1 parents is bad enough; Field Guidance 11's background check waivers for adult household members and alternate adult caregivers of Category 2 sponsors (including public records and sex offender registry checks) is nothing short of playing roulette with the security of children. One case manager reported to us having to release a teenage female UAC to a male sponsor who had multiple other unknown males living in the same residence— all of whom were unidentified. This was not an isolated incident. A transportation contractor told us he observed a sponsor groping the teenage UAC he had just dropped off.

Often overlooked is the fact that *__both background and fingerprint checks only account for activity within the United States__*. Unless a sponsor volunteers it, there is no way for case managers to reliably ascertain whether the sponsor (very often themselves a recently-arrived alien) has a criminal or sex offense record or other concerning behavior (drug addiction, child trafficking, gang affiliation) in their country of origin. Case managers reported being discouraged from even trying. One did learn that a sponsor had an Interpol "Red Notice" which thankfully was detected.

19

Another found out that a female sponsor applicant was not only a gang member, but also wanted in El Salvador for a RICO-style set of charges involving her boyfriend, a gang kingpin who was in prison there. Despite actually getting the charging documents and other information *from the sponsor herself,* the manager was ordered to allow the placement; when she resisted, the case was reassigned and the sponsor received not only the child in question, but the child's sibling as well. As a further reminder, the persons assessing the significance of any records that do turn up have almost uniformly zero law enforcement or legal training or experience.

***Even outright refusal to submit to these minimal checks*** is not fatal to a sponsor's attempt to take the child. ORR's Policy Guide states that it "may deny release," but ORR will "consider the totality of the circumstances, including the adult household member's refusal and all other relevant and available information to determine whether the release process may continue." There is no requirement to deny placement with a sponsor if a sponsor or household member refuses to provide information to enable a background check. If a sponsor is found to have ***submitted fraudulent documents*** (a felony), they will be reported to the ORR Inspector General (not to federal or state law enforcement). In some instances, we were told, they were allowed to try again using different documents, over the objections of case managers.

Case managers will check GoogleEarth or SmartyStreets.com to verify that the sponsor's address is classified as residential and that the address identified on GoogleMaps. As a rule, they do NOT actually go see the inside of the location they are sending a child to live. Close checking is also discouraged; witnesses related to us how some sponsors used the "address" of a Jacksonville, FL strip club, empty lots surrounded by stacked shipping containers, or open fields, yet their concerns were brushed aside and placements ordered. As one witness reported, they were told after voicing concerns that "we can't judge where people are forced to live"—while being ordered to force a child to live in such circumstances.

Case managers are able to conduct home studies of sponsor residences if they feel the need—in theory. However, this is another safety rail often discouraged and ignored. In its 2018 report, the Senate Subcommittee found that HHS conducted home studies in ***fewer than 4.3 percent*** of cases between 2013 and 2015, and even though home studies are required by law in certain circumstances, the Subcommittee found several examples where HHS failed to conduct them. The numbers have not improved. For Fiscal Year 2021, ORR took custody of over 122,700 children but

conducted only 5,468 home studies—or 4.5 percent of cases, less than half of the average number between fiscal years 2017 and 2020. ORR does not universally require home studies for all children 12 or older, despite these children being at higher risk for labor trafficking. Of the 245,515 children placed with sponsors between August 2018 and January 2022, only 1,835 received discretionary home studies—or ***less than one percent of cases***.

Moreover, a disturbing pattern has emerged whereby the same sponsor applies to receive multiple UAC—sometimes at the same address, sometimes at a different one. Some individual sponsors apply to receive more than one child, at more than one address, ***simultaneously***. One address in Texas had 44 children sent to it; another had 25. One sponsor in Bonita Springs, Florida, had multiple children sent to multiple addresses, and he applied using different versions of his hyphenated surname. One address in Austin, Texas, had more than one hundred UAC released to a single-family dwelling.

We have seen and heard UAC relating details of being "pimped out" by their "aunt" (whom they did not know prior to arriving in the United States); some who had run away from their sponsor because they were being sold for sex; being teenaged females living in a house full of unknown adult males with no private bedroom; being children aged seven left with an unknown male while their sponsor was working; UAC relating that they had to drop out of school and work to pay debts for their passage, as well as pay their family's debt to coyotes in their home country; UAC disclosing how they call friends of their sponsor to obtain fraudulent documents to enable them to work; UAC displaying the fake documents; UAC disclosing that they and their families overseas actually paid their "sponsor" to apply for their custody, and that they never actually went to live with that sponsor; UAC relating that they and other UAC rode together to work sites arranged by their sponsors "wherever they take me"; and UAC relating that their **sponsor had been sent to prison in Florida, for Felony Battery upon a child**.

Case managers related events they observed where UAC reported that the sponsor would hold up an 'Order of Deportation' and threaten that "If you do not do what I say, when I say, I'm going to call ICE on you myself." Another Case Manager related the saga of one gang-affiliated female sponsor who was initially denied placement; she threatened to bring her "angels" to see the case manager outside of work. The case manager was assigned a personal security detail due to the sponsor's

asserted gang connections. Yet the case was given to a different manager, and the UAC was released to the sponsor.

One of the Florida organizations partially responded to our records request by disclosing that it had received 665 UAC in 2021-2022 but only had 132 sponsors during the time frame, and placed a total of 598 UAC, with 188 of them having unsuccessful post-placement contact during the same time frame. It appears that 67 UAC remain unaccounted for. If 598 UAC were placed with only 132 sponsors, each received an average of 4.5 UAC. Another organization disclosed that it recently received 538 UAC but placed only 374; it received 487 UAC in FY 2022 but placed only 319. A third received 950 and placed 794. A fourth received 503 and placed 429. They could not specify the status of the rest.

According to ORR, "potential sponsors must submit at least one identification document that contains a photograph." However, expired identifications may be used and permissible photo IDs include easily-forged items such as foreign drivers licenses and benefit cards. As for proof of a relationship between Sponsor and Child: DNA testing is not required. Failure to submit proof of relationship is not a disqualifying factor; rather, ORR's Policy Manual states that it is taken into account "along with the totality of the evidence." For Category 2 sponsors, a simple "affidavit attesting that they were the child's primary caregiver" will suffice. We also found it odd that a "baptismal record" from the UAC's church in their home country would be an acceptable piece of identification for this purpose.

Documents by which a sponsor is to establish their identity and relationship to the UAC are almost never provided in person; indeed, many case managers never meet the sponsor in person at all. ***Interviews are conducted almost entirely by phone, and documents are provided via email or What's App.*** In no small part this is because many facilities housing UAC are geographically remote from their ultimate sponsor destination.

We also heard testimony from a former employee of the primary company used by ORR to transport minors across the nation (and a current federal employee). According to him:

> -he transported minors that look like adults and he's told by other children that they lied about their age. In many cases, "they got more facial hair than I do. They got tattoos."

-UAC told him and his colleagues that they threw their papers away before crossing the border because they stand a better chance of coming into the country without papers—confirming other evidence we received.

-UAC admit that their parents are already living illegally in the United States and they've paid a smuggler to bring their child across the border. The children claim they were promised money if they spent two or three months with the sponsor, and can't wait till they get to spend it.

-Sponsors will admit 'Oh, I'm not a family member, I'm not the kid's father, I'm not the kid's mother, I'm not blood-related, I'm just a 'friend'. UAC admit they met their sponsor through Facebook or a social media app.

-Transporters can often tell legitimate family from bogus "sponsors." "They would cry, they would hug them. But now it's no more crying, no more hugging, it's just 'Hey, I'm here to pick you up.' And that's it. They won't look at the kid. They will be upset that they have to show up to the airport," sometimes inebriated.

-One co-worker had to take a teenage girl to a male sponsor in his 40s that she had never met before, only chatted with on FaceTime from a shelter. One UAC related that a sponsor had to pay double so their niece would not be molested.

-Other employees have also been handing over children to adults who aren't the designated sponsor on the paperwork provided by HHS. One woman in her 30s came to pick up two *unrelated* boys in San Antonio. "These kids are being sent off with neighbors, with people who are nowhere near related to these kids."

-The company discourages complaints about sponsors. "Our job is to escort and that's it. But we're not allowed to bring strange sponsors up. As long as it's a person who shows up and gives you documentation, we leave the child." Failure to do so is a fireable offense; employees who retained custody of minors in the face of suspicious "sponsors" were accused of actually kidnapping the UAC.

-Employees often don't have a background check until months after hiring (his own took more than six months), yet are permitted to work alone in the company of minors.

23

We have also reviewed nearly a dozen reports prepared by other agencies of the federal government and Congressional committees regarding ORR and how it goes about its business. Simply put, ORR has a rather spotty record when it comes to vetting sponsors, and has intentionally gutted many of the protections for minors that were in place regarding the identities and backgrounds of the adults to whom they were given. We believe this is why the agency does all it can to keep the public from knowing what is going on.

All this has been a documented problem for some time, though it has not gotten the public attention it deserves. According to other evidence and testimony we received, including a Senate subcommittee report and a 2016 press release from the Department of Justice:

> ***ORR placed eight children with members of a human trafficking ring***. The traffickers enticed the children to come into the United States, promising they could attend school. When CBP apprehended the children at the border and placed them in custody, the traffickers applied as sponsors, pretending to be family friends. Once HHS released the children to the traffickers, the traffickers forced them to work on an egg farm in Marion, Ohio for 12 hours a day, six or seven days a week. The children lived in poor conditions, and the traffickers threatened them and their families with physical harm and even death if they did not work and surrender their paychecks. According to the indictment, the traffickers "used a combination of threats, humiliation, deprivation, financial coercion, debt manipulation, and monitoring . . . to create a climate of fear and helplessness that would compel [the victims'] compliance." Seven people pled guilty to Federal charges for their roles.
>
> The leader of a human trafficking organization and a co-defendant were sentenced to prison. Castillo-Serrano pleaded guilty on Aug. 24, 2015, to conspiracy to commit forced labor, forced labor, witness tampering and alien harboring charges. Pedro-Juan pleaded guilty on Dec. 14, 2015, to conspiracy to commit forced labor. According to documents filed in the case and admissions made in court in connection with the guilty pleas, the defendants and their associates recruited workers from Guatemala, some as young as 14 or 15 years old, by falsely promising them good jobs and a chance to attend school in the United States. The defendants then smuggled and transported the workers to a trailer park in Marion, Ohio, where they ordered them to live in dilapidated trailers and to work at physically demanding jobs at Trillium

Farms for up to 12 hours a day for minimal amounts of money.  The work included cleaning chicken coops, loading and unloading crates of chickens, debeaking chickens and vaccinating chickens.  Eight minors and two adults were identified in the indictment as victims of the forced labor scheme.

Castillo-Serrano recruited the victims, smuggled them into the United States, oversaw money transfers and issued threats to ensure compliance.  Pedro-Juan falsely represented herself to government officials as a family friend of the minor victims in order to have them released to her custody.  She also oversaw the trailers where the victims were housed and arranged for their wages to be transferred to co-conspirators in Guatemala and elsewhere.

After a sponsor is located and approved, the UAC are transported to meet and go home with them (or the sponsor may pick the UAC up at a predetermined location). ORR mandates that for a period of 30 days post-unification, case managers attempt to contact (by phone or otherwise) the sponsor and/or the UAC to determine if things are well; they are required to make at least three attempts to do so.  Only if the UAC reports a problem does ORR mandate further action; if the attempts are merely unsuccessful or whoever answers the phone reports no problem, then, ___*30 days after placement*___, ORR considers that is has transferred custody of the UAC, has no further responsibility as a matter of law, and closes its case.  ___*At that point, the UAC is, as far as the federal government is concerned, no longer in their custody*___.  Case managers (and mental-health or medical treatment providers) are categorically prohibited from further follow-up, ___*even if the UAC contacts them*___.

### VI. What Happens to Them?

In too many cases, no one knows.

A 2001 report by the Department of Justice Office of Inspector General found a number of problems, including issues with transporting children, oversight of child shelters, the length of time children spent in custody before release, and kidnapping of children post-release.  Twenty years on, the issues remain.

___*In one three-month period*___ in 2017, ORR discovered it had lost nearly 1500 children.  According to the testimony of Steven Wagner, Acting Assistant Secretary of ACF/HHS before the Permanent Subcommittee on Investigations on Homeland Security and Governmental Affairs (April 26, 2018):

**From October to December 2017**, ORR attempted to reach 7,635 UAC and their sponsors. Of this number, ORR reached and received agreement to participate in the safety and well-being call from approximately 86 percent of sponsors. From these calls, ORR learned that 6,075 UAC remained with their sponsors. ***Twenty-eight UAC had run away, five had been removed from the United States, and 52 had relocated to live with a non-sponsor. ORR was unable to determine with certainty the whereabouts of 1,475 UAC.***

In January 2016, that Subcommittee released a report entitled "<u>Protecting Unaccompanied Alien Children from Trafficking and Other Abuses: the Role of the Office of Refugee Resettlement.</u>" That report found that HHS placed several children with sponsors without taking sufficient steps to ensure that the placements would be safe. The report also highlighted instances where the agency ***failed to***:

-investigate the relationship between the sponsor and child;

-run background checks on the adults in the sponsors' households and secondary caregivers;

-visit sponsors' homes prior to placement;

-determine whether sponsors were accumulating multiple unrelated children; and

-conduct post-placement follow-up to ensure the child was safe.[11]

The Subcommittee found many issues documented in its 2016 report remain unaddressed, but also additional problems including that HHS "could not ascertain with certainty" the location of nearly 1,500 children placed with sponsors. HHS argued it had no legal responsibility to track children after placement with a sponsor. The 2018 report also addressed concerns about the treatment of unaccompanied alien children in HHS custody at shelter facilities.

This is not the first time in recent years that such issues have been exposed— despite ORR's best efforts to keep them from the sunlight. In 2022, Reuters reported "Dozens of migrant children reported missing in Houston, raising alarms." In

---

[11] Both ORR and its care providers love to tout their "post-release services," where they supposedly give UAC contact information to see doctors, therapists, call hotlines, and the like. We note that, as previously mentioned, attempts at arranging this extend no more than thirty days from placement; the sponsor is ultimately the only individual who can decide whether the services are provided at all and, more problematic, we received testimony from case manager supervisors that "75% of the kids are supposed to have it, but nobody is actually assigned to do it."

September 2021, Axios reported that ORR "has lost contact with thousands of migrant children released from its custody," with nearly a third of calls to these minors or their sponsors going unanswered. In October 2021, Arizona Rep. Andy Biggs wrote a letter to the Department of Health and Human Services, demanding to know how ***HHS was "unable to contact 19,726 sponsors of unaccompanied alien children since January 2021***." ORR lost contact with nearly 20,000 UAC in less than a year.

We learned from some former employees of charitable organizations that some UAC have encountered serious trauma in the course of their journey and require mental health treatment, sometimes long-term. Yet UAC are retained only for a matter of a few weeks at most before they are placed, making it exceedingly difficult to diagnose or especially treat some of the significant conditions they suffer from. One former therapist tearfully reported that such rapid placement effectively undermines her best attempts at counseling and certainly makes it difficult for the UAC to trust another therapist even if they see one, since they often express that the first one has "abandoned" them.

Pro Publica reported in November 2020 on the "Lives of Immigrant Teens Working Dangerous Night Shifts in Suburban Factories," where "at night while their classmates sleep, they work to pay debts to smugglers and sponsors," and "use fake ID's to get the jobs through temporary staffing agencies that, knowingly or not, accept the papers." The New York Times reported in February 2023 that they "spoke with more than 100 migrant child workers in 20 states who described jobs that were grinding them into exhaustion[.] In town after town, children scrub dishes late at night; they run milking machines in Vermont and deliver meals in New York City. Girls as young as 13 wash hotel sheets in Virginia." We also heard from a Florida teacher whose former middle school English Learning immigrant students routinely report working long hours at adult jobs. And last month, DHS launched an investigation into a meat-packing plant in Nebraska where 50 UAC, some as young as 13, were illegally employed and forced to endure dangerous working conditions.

The failure of ORR to place UAC with responsible sponsors places a substantial financial burden on the State of Florida. Annually, more than four hundred UAC end up in the dependency and foster care system here in Florida. The UAC then become wards of the foster care system, which does a thorough job of vetting their next placement. Each must be provided education, food, shelter, and

medical care by our State, and for the duration of their childhood someone will be legally responsible for their welfare.

>   As the <u>Florida v. United States</u> court found,

>>   In the 2020-21 school year there were just over 95,000 immigrant children and youth in Florida's public schools. That number increased by more than 17,000 in the 2021-22 school year[.] … Florida spends roughly $8,000 per public school student per year, and an increase in the number of students in Florida's schools requires the state to spend more money over time. *Supra*.

### VII. No Help Is Coming, It's Up to Us

ORR and its contractors claim to employ a thorough process to ensure safety. However, as one witness put it,

>   "I was there.  I saw what was going on.  These people (ORR and its contractors) are aware of what's happening.  ***They aren't naïve—they're complicit*****."**

We share this conclusion, and use the following (taken from a federal court opinion) for illustration of the point:

>>   Ms. Nava–Martinez, an admitted human trafficker, was caught at the Brownsville & Matamoros Bridge checkpoint. She was trying to smuggle Y.P.S. into the United States using a birth certificate that belonged to one of her daughters. …This conspiracy was started when Patricia Elizabeth Salmeron Santos solicited human traffickers to smuggle Y.P.S. from El Salvador to Virginia. Salmeron Santos currently lives illegally in the United States. She applied for a tourist visa in 2000, but was turned down. Despite being denied legal entry into the United States, she entered the United States illegally and is living in Virginia.

>>   Salmeron Santos admitted that she started this conspiracy by hiring alien smugglers to transfer her child from El Salvador to Virginia. She agreed to pay $8,500 (and actually paid $6,000 in

advance) for these human traffickers to smuggle her daughter… Nava-Martinez was arrested, and the child was taken into custody. The DHS officials were notified that Salmeron Santos instigated this illegal conduct. Yet, instead of arresting Salmeron Santos for instigating the conspiracy to violate our border security laws, the DHS delivered the child to her—thus successfully completing the mission of the criminal conspiracy. It did not arrest her. It did not prosecute her. It did not even initiate deportation proceedings for her... A private citizen would, and should, be prosecuted for this conduct.

This is the fourth case with the same factual situation… in as many weeks. In all of the cases, human traffickers who smuggled minor children were apprehended short of delivering the children to their ultimate destination. In all cases, a parent, if not both parents, of the children was in this country illegally. That parent initiated the conspiracy to smuggle the minors into the country illegally. He or she also funded the conspiracy. In each case, the DHS completed the criminal conspiracy, instead of enforcing the laws of the United States, by delivering the minors to the custody of the parent illegally living in the United States. …

In each of the four cases, the Government also incurred significant expense to help complete the conspiracy. In all cases when the Government apprehended some of the traffickers, the Government transported the children across the country to unite them with a parent (or parents) who was in the country illegally. In one situation, the Government flew a child to multiple locations in different parts of the United States. The taxpayers of the United States suffer the expense of delivering these minors. This expense includes not only the cost of paying travel, room and board for the children, but … include[s] the salary and travel expenses of a guardian to accompany them. This is an absurd and illogical result. The DHS could reunite the parent and child by apprehending the parent who has committed not one, but at least two different crimes. It would be more efficient for the Government to arrest the individuals who are not only in the country illegally, but while in the country illegally are also fostering illegal conspiracies. It would also be much cheaper to apprehend those co-conspirators and reunite them

at the children's location. Yet, it neither prosecutes nor deports the wrongdoer.

The DHS is rewarding criminal conduct instead of enforcing the current laws. More troubling, the DHS is encouraging parents to seriously jeopardize the safety of their children. While Y.P.S. was transported in a car, others are made to swim the Rio Grande River or other bodies of water in remote areas. This concern for the safety of these individuals is not fanciful or theoretical; it is a real and immediate concern. …

First, and most importantly, these illegal activities help fund the illegal drug cartels which are a very real danger for both citizens of this country and Mexico. Mexican cartels control most of the human smuggling and human trafficking routes and networks in Texas. The nature of the cartels' command and control of human smuggling and human trafficking networks along the border is varied, including cartel members having direct organizational involvement and responsibility over human smuggling and human trafficking operations, as well as cartel members sanctioning and facilitating the operation of human smuggling and human trafficking organizations. In other circumstances, human smuggling organizations are required to pay the cartels for operating their networks and routes in their territory [A]liens being smuggled were assaulted, raped, kidnapped and/or killed. …

Mexican cartels, transnational gangs, human trafficking groups, and other criminal organizations engage in a wide range of criminal activity in Texas, including murder, kidnapping, assault, drug trafficking, weapon smuggling, and money laundering. However, by far the most vile crime in which these organizations and other criminals are engaged is the exploitation and trafficking of children. These crimes are also carried out and enabled by prostitution rings, manufacturers and viewers of child pornography, sexual predators, and other criminals. Regardless of who perpetrates these crimes or their motives, this category of criminal activity is especially heinous, as it takes advantage of children and subjects them to violence, extortion, forced labor, sexual assault, or prostitution.

The methods and means used by smugglers to transport and hold aliens subject them to high degrees of risk. Unsafe vehicles and drivers, squalid conditions in stash houses, rugged terrain, and harsh elements create dangerous circumstances. Hundreds of illegal aliens have died in Texas and elsewhere along the border...

In addition to these dangerous methods and means, smugglers also regularly use violence, extortion, and unlawful restraint against illegal aliens. In some cases, they are forced to perform labor, and females—including minors—may be sexually assaulted. Some are subjected to physical assaults if payments are not received, and several have died while being held in stash houses in Texas. And just as drug traffickers may attempt to steal drug loads from rival traffickers, criminals sometimes attempt to steal or hijack groups of aliens from smugglers...

These entities are not known for their concern for human life. They do not hire bonded childcare providers to smuggle children. By fostering an atmosphere whereby illegal aliens are encouraged to pay human smugglers for further services, the Government is not only allowing them to fund the illegal and evil activities of these cartels, but is also inspiring them to do so. The big economic losers in this scenario are the citizens of the United States who, by virtue of this DHS policy, are helping fund these evil ventures with their tax dollars. The overall losers, who endure the consequences of this policy, are the citizens on both sides of the border who suffer from the nefarious activities of the cartels.

Second, the DHS's current policy undermines the deterrent effect the laws may have and inspires others to commit further violations. ...Further, this policy is encouraging individuals to turn their children over to complete strangers—strangers about whom only one thing is truly known: they are criminals involved in a criminal conspiracy. Children, such as Y.P.S., are especially at risk.

Some children are more vulnerable to exploitation, such as unaccompanied alien children (UAC). .... If they persist in this policy, more children are going to be harmed, and the DHS will be partly responsible because it encourages this kind of Russian roulette.

Finally, this policy lowers the morale of those law enforcement agents on the front line here on the border. These men and women, with no small risk to their own safety, do their best to enforce our laws and protect the citizens of the United States. It seems shameful that some policymaker in their agency institutes a course of inaction that negates their efforts. It has to be frustrating to those that are actually doing the work of protecting Americans when those efforts are thwarted by a policy that supports the lawbreakers.

[T]he decision to separate Salmeron Santos from Y.P.S. was made years ago, and it was made by Salmeron Santos. She purposefully chose this course of action. Her decision to smuggle the child across the border, even if motivated by the best of motives, is not an excuse for the United States Government to further a criminal conspiracy, and by doing so, encourage others to break the law and endanger additional children. To put this in another context, the DHS policy is as logical as taking illegal drugs or weapons that it has seized from smugglers and delivering them to the criminals who initially solicited their illegal importation/exportation. Legally, this situation is no different.

We read this with a feeling of *déjà vu,* based upon our investigation. But it was not written recently by a grand jury. It is not the result of current events.

Instead, it is the opinion of a federal Court, written ***ten years ago***. United States v. Nava-Martinez, CRIM. B-13-441-1, 2013 WL 8844097, at *1–5 (S.D. Tex. Dec. 13, 2013). Although the program has been moved to ORR by virtue of a change in federal statutes, the problems followed from one agency to the next. HHS/ORR and their providers were on notice of what these practices mean for UAC at least since then, and it has clearly mattered not a whit—indeed, Y.P.S. was at least given to her actual parent; UAC are now given to many persons ***other*** than parents. As the witness told us, those involved are not ignorant, but complicit.

<u>Fake Families and Recycled Kids</u>

We learned that children are often found to be exploited as part of a "fake family" or even "recycled" to assist the entry of multiple other individuals.[12] We received evidence from current and former federal law enforcement authorities that

---

[12] Also arrested at the border: 69 individuals whose names appeared on the terror watchlist in the first five months of fiscal year 2023, added to 98 captured in fiscal year 2022, according to CBP.

children are often used as lottery tickets to get the whole family across the border at a huge discount.  Human smugglers or brokers in home countries cut package deals with a parent of two or more children; they pay the parents for the ability to take one of their children over the border, defraying the cost to parents who would keep one child to take over themselves. Parents who agreed to do this could have most or all of the entire family's smuggling fees waived. The international criminal cartel "parents" – a/k/a smugglers, would cover the costs.  When fake families are discovered, the children are not deported, but instead become UAC.

Sometimes smugglers included altered, counterfeit, or fraudulently attained birth certificates that would match children to customers in search of a human visa and willing to pay for them; the younger the child the better, since they couldn't answer Border Patrol questions and thus expose the scam.  Border Patrol agents often reported encountering single men carrying infants but nothing to indicate actual parenthood (no baby formula, bottles, diapers, or any items suggesting care of infants), or babies and young children alone wandering through cornfields on the U.S. side of the border, where the "parent" had dumped them after they served their purpose.

ICE's "Operation Noble Guardian" identified 35 adults who have entered with a child that has now departed the US and identified a woman personally responsible for recycling **more than 60** children to the Northern Triangle, across multiple trips. We also received evidence regarding Honduran national Valentin Bardales-Antunez, arrested at the Greenville-Spartanburg Airport while attempting to arrange travel for a minor child being sent back to Honduras via commercial airline.  Bardales-Antunez entered the U.S. unlawfully and had pending criminal charges in Greenville County following his arrest by the Greenville Sheriff's Office in 2017 for three counts of disseminating obscene images to a minor and one count of soliciting a minor.

We learned about one recent case which is still pending sentencing.  Court records indicate that:

In February 2019, Belkin Idania Martinez-Parada, a Honduran mother of four, agreed to a scheme to rent three of her four children, ages six months to twelve years, to three different Honduran men so they could pass through the Texas border as families. Martinez-Parada would thereby earn free passage for herself and all four kids. *The men had all been previously deported more than once* and would be deported back to Honduras if they tried crossing as singles.  But they knew if they

came in with a child, Border Patrol would let them pass even though they were deportable. Each of the three men received a fraudulently obtained birth certificate indicating the child belonged to them. The whole group traveled together with a smuggler up to the border, then split up for separate crossings.

Martinez-Parada kept the twelve-year-old daughter in Mexico for another month. As for the others, she:

-gave the six-month-old infant to a stranger who flew with the baby to Florida;

-gave the eight-year-old girl to a second stranger, who took her to Houston; and

-gave the six-year-old boy to a third man.

This third man got caught lying at the border and Border Patrol decided to deport him. He confessed everything because he did not want to take the boy back with him.

The Houston-bound man who had the eight-year-old daughter began complaining on Facebook that he eventually had to leave the child alone every day so he could work. One day, a neighbor found her wandering in the parking lot of the apartment complex and took her in but didn't call the police. If she had, the smuggler wrote on Facebook, "I'd be back in Honduras."

The deported fake father left the 6-year-old in detention; the infant in Florida was left with a family of strangers for months.

This particular scourge could be (and previously was) greatly diminished. As Acting Deputy Director Derek Benner of US. I.C.E. testified on November 13, 2019:

> Human smugglers are currently capitalizing on the trend of **fraudulent families** crossing the border to enter the United States. The cartels and human smugglers are well versed in our inability to detain family units for the length of time necessary for their cases to be complete, in large part due to the Flores Settlement Agreement (FSA) and judicial decisions that interpret it. This enabled certain aliens, by falsely claiming to be a legal family unit or UAC, to gain entry into the United States, avoid immigration custody, and then never appear for their immigration proceedings. Family units are often released with little or no consequences for their illegal entry.

In response to this crisis, ICE dedicated over 400 HSI personnel to assist in combating this issue. HSI deployed teams of special agents, intelligence analysts, forensic interview specialists, and document fraud examiners to the Southwest Border. These teams interviewed groups suspected of fraudulently claiming familial relationships, specifically a parent-child relationship, in order to facilitate human smuggling activity. As a result, *__between mid-April and October 31, 2019, HSI identified 653 fraudulent family units, 1,025 fraudulent documents, and presented 1,168 individuals for criminal prosecution__*, with 1,024 being accepted for prosecution. In a particularly egregious incident investigated by HSI, an adult Guatemalan male presented at the border with a 16 year old minor female who he fraudulently claimed to be his child. Upon being released from custody he took the minor female to the southeastern United States where he raped and beat her on a regular basis until she was rescued.

In addition to the fraudulent family incidents, HSI has also been identifying **adults who are fraudulently presenting themselves as minors**. As of October 31, 2019, HSI has identified 170 adults fraudulently claiming to be minors, of which 143 of those individuals were accepted for prosecution. I would like to take a few moments to discuss two current HSI national operations created to address the fraudulent family issue.

Operation Double Helix: Rapid DNA Testing

From May 6 to 10, 2019, HSI initiated a rapid DNA pilot called Operation Double Helix in El Paso and in McAllen, Texas. Both sites were selected for this initiative because they were considered the sectors with the highest family unit apprehensions along the Southwest Border. Selection of family units for Rapid DNA testing was based on factors such as key observations obtained during interviewing, intelligence gathering, documentary evidence, and any investigative information developed during immigration processing. ... The goal of this operation was to remove children from these dangerous and potentially exploitative situations. During this initial pilot, a total of 84 family units were DNA tested after providing consent and *__16 family units were found to be fraudulent during the testing__*. About half of the

confirmed fraudulent family units were identified prior to DNA testing when the adult alien recanted their claim of a familial relationship when asked to consent to a DNA test. The teams were also advised by U.S. Border Patrol agents that **other subjects within the processing facilities not selected for testing voluntarily came forward and admitted they were part of a fraudulent family, as they learned that DNA testing was being conducted**. ...In September 2019, the pilot expanded to three additional locations bringing the total number of testing locations to 10. ___As of October 31, 2019, Operation Double Helix 2.0 has resulted in 1,613 family units being tested with 207 family units (13 percent) testing negative for a familial relationship. Based on those results, 298 individuals have been presented for prosecution___ and 168 have been accepted.

Operation Noble Guardian:

In early May 2019, HSI's Human Smuggling Unit (HSU), in coordination with the CBP National Targeting Center's (NTC) Counter Network Division, initiated Operation Noble Guardian. As previously mentioned, some aliens are exploiting our immigration laws, fraudulently claiming to be family units, avoiding detention and/or prosecution, and are subsequently released after being processed in an expedited fashion. The NTC assisted HSI in identifying adult aliens and accompanying alien children that entered the United States as alleged family units, where the children subsequently departed the United States via commercial airlines to Northern Triangle countries. **As of October 31, 2019, 466 migrant children who were processed as part of a family unit have since departed the United States.** ... Many of these adults involved in fraudulent family units since their entry into the United States have been identified as absconders from ICE ERO and are now being targeted for arrest and removal from the United States. *As of November 1st, ICE has arrested 232 individuals targeted for their involvement in these activities*.

ICE did significantly curtail fake family abuse in 2019 by deploying rapid *DNA testing* to eleven locations across the southern border. As part of testing the pilot program when it first came out, about *20 percent of those tested failed*. Others, faced with the prospect of undergoing testing, confessed up front. The DNA

initiative arose in large part due to the testimony of a whistleblower, who reported that nearly 3,700 sponsors on a list of 20,000 had criminal records, including some who had convictions for child molestation.  That was 2015, and it took nearly four years to implement these pilot programs.  However, we also received evidence that despite the relative success of these programs, ***DNA testing is no longer conducted as a matter of course***.

The DNA testing has all but ended, with only a few dozen a month being conducted because, as the *Washington Examiner* quoted a DHS official, "This administration wants these families and kids released quickly. That is their No. 1 goal, so they are not going to do anything to slow that process down." Likewise, on May 8, 2022, the *Wall Street Journal* reported that according to three high-ranking Brazilian federal police investigators, several thousand Brazilian children entered the U.S. with an adult who was falsely claiming to be their parent—multiple children brought over with one of them accompanying a fake parent for the border crossings, and the real parent getting paid $5,000 for allowing it, helping to defray the biological parent's smuggling fee.

We see no reason that, given the demonstrated success of ICE's Rapid DNA testing, it would not be a central part of ORR placement decisions and vetting of sponsors.  Perhaps the easiest way to ascertain the biological relationship of two individuals is to let their chromosomes do the talking.  Case managers would be spared attempts at interpreting documents easily faked or comparing stories to spot red-flag inconsistencies—as well as the pressure to process as fast as possible.  ORR and its companion organizations clearly know the way to reduce hazardous placements and phony family ties.  What appears to be lacking is the will, the sense, or both.

### VIII. Impacts on Florida

The Florida Department of Children and Families took the time and trouble to research, revise, and publish multiple Emergency Rules on this subject, the most recent and current of which is Emergency Rule 65CER22-1.  The Department found as follows:

SPECIFIC REASONS FOR FINDING AN IMMEDIATE DANGER TO THE PUBLIC HEALTH, SAFETY OR WELFARE:

...The surge of foreign nationals attempting to enter illegally at the southwest border has included a large number of Unaccompanied Alien Children (UAC), defined by federal law as a child who has no lawful immigration status; has not attained 18 years of age; and, with respect to whom, there is no parent or legal guardian in the United States, or no parent or legal guardian in the United States available to provide physical custody and care, see 6 U.S.C. § 279(g)(2). ... It is estimated that at least 4,284 UAC were housed in group home facilities or foster homes in Florida over the last year. During federal fiscal year 2021, 11,145 UAC were placed with sponsors in Florida, more than the 10,773 UAC placed in California, a substantially larger state.

Neither DHS nor HHS actively coordinates or consults with the State of Florida, including the Department, on the UAC that are resettled in Florida. The State does not receive meaningful, if any, advance notice when UAC are transported to Florida and is not meaningfully consulted on the number of UAC that the State's child-caring resources and capacity could feasibly support without adversely affecting children already present in Florida and under the State's protection and care.

Moreover, the State receives no information on the background, criminal history, immigration status, status of removal proceedings, or the sponsors of the UAC brought to Florida. ...UAC are regularly placed with sponsors without adequate follow-up by HHS or the placement entities to ensure the safety and welfare of the UAC. According to a recent report, between January and May 2021, federal contractors responsible for placing UAC with sponsors across the United States were unable to reach the minor or the sponsor in roughly one of every three attempts. Nor does the State have any assurance that the UAC are, in fact, minors. ... In short, the Federal Government has failed to provide the State of Florida with sufficient answers to its requests for information on the resettlement of illegal aliens, including UAC, so that their safety and the safety and welfare of Florida's citizens, including children already present in Florida, can be secured... an immediate danger to the safety and welfare of Floridians, including its most vulnerable children, as well as recently arrived UAC. (The Federal Government's conduct with respect to the resettlement of UAC in Florida stands in stark contrast to the Federal Government's conduct

with respect to the resettlement of Unaccompanied Refugee Minors (URM), where the Federal Government has a cooperative agreement in place with the State of Florida.)

Given the ongoing crisis at the border, including the Federal Government's failure to enforce federal immigration law and to secure the border, the resettlement of UAC in Florida, its ongoing refusal to provide meaningful coordination and consultation, its failure to provide adequate protection for and supervision of UAC once they are placed with sponsors in the state, and its failure to adequately screen purported UAC (as evidenced by the recent murder charge brought against an adult foreign national who misrepresented his age to gain entry to the United States), emergency rulemaking is justified and necessary.

DCF's conclusions align with our own. The Department appropriately enacted the Rule which essentially resulted in many UAC shelters not qualifying for Child Placement Facility licensure any longer. The response from ORR was to ***waive the longstanding federal requirement that their placement agency be licensed by the State in which they operate, and tell them to continue with business as usual.***

We understand that the Department is finding difficulty enforcing its own rule, due to resistance from placement agencies. Organizations—some of whom signed on to a letter requesting that the Governor order DCF to rescind their rule--continue to operate even without a license. Some have sued the Department. There is no need to rely on an Emergency DCF Rule to vindicate the interests of the people of this State. If ORR and their partners want to continue their dangerous operations despite what has been outlined, our legislature should step in.

The Constitution gives Congress—not Executive Branch officials such as ORR or their contractors— "complete and absolute power" over the subject of immigration and "plenary power" over the admission and exclusion of aliens. See, e.g., Kleindienst v. Mandel, 408 U.S. 753, 766 (1972) (quoting Boutilier v. INS, 387 U.S. 118, 123 (1967)); Oceanic Steam Navigation Co. v. Stranahan, 214 U.S. 320, 343 (1909).

What the Constitution does ***not*** do, though, is prohibit states from determining the legal requirements for residents taking custody of children other than their own living in the state.

Legal relationships between parents and children are typically governed by state law, there being "no federal law of domestic relations." Accordingly, subject to possible limitations, we think that the requirement of "legal custody" in section 1432 should be taken presumptively to mean legal custody under the law of the state in question.... [T]his view is consistent with the approach taken in other cases in which a federal statute depends upon relations that are primarily governed by state law.

Bagot v. Ashcroft, 398 F.3d 252, 258 (3d Cir. 2005).

As the Senate Subcommittee Report found,

ORR policy explicitly states, "[o]nce a child is released to a sponsor, ORR's custodial relationship with the child terminates." However, the transfer is of physical custody only. ***Unless the sponsor is a parent or legal guardian (Category 1), sponsors do not have legal custody of an unaccompanied alien child without taking further legal steps***.

The Homeland Security Act of 2002 defines an "unaccompanied alien child" as one for whom ". . . (i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody." In accordance with this definition, a non-parental sponsor or non-legal guardian ***(Category 2 and 3) are not legal guardians unless they obtain an order from a state court***.[13] (Emphasis supplied).

ORR recognizes this in its Sponsor Care Agreement, which sponsors are required to sign; they are urged that "If you are not the minor's parent or legal guardian, make best efforts to establish legal guardianship with your local court

---

[13] It is worth noting that the Subcommittee took pains to point out that in fact it considered ORR's interpretation to be incorrect, and that the agency was shirking its statutory obligations: "HHS's interpretation of its legal responsibility for unaccompanied alien children, as defined by the Homeland Security Act of 2002, directly contradicts the plain language of the statute. . . HHS's refusal to take responsibility for these children after placement with a sponsor other than a parent or guardian undermines those children's safety, our immigration system, and the rule of law." Nonetheless, ORR continues its practice, and children not placed with a parent are—legally speaking—in complete limbo as far as any adult having a legal duty to them.

within a reasonable time."  Such suggestions are ineffective motivators in this situation.[14]

> ***At no point in the UAC process is any court involved, or any determination by a judicial officer made as to adoption, permanent or temporary custody, or the best interests of the child.  As a result, thousands of children in Florida are surrendered to adults who are not their parents, and therefore have no legal custodial authority—leaving the child in legal limbo.***

These individuals cannot legally authorize medical treatment for the child or exercise any of the myriad other functions of a legal custodian. What is more, UAC are not yet citizens; they are required to appear for immigration court dates, attend school, and are precluded from holding certain types of employment. Without legal status as a citizen, and without legal status as a child or ward of a specific person, UAC exist in a vulnerable situation of ORR's making. When citizen children require medical care, their parent or guardian can obtain it or give permission for them to receive it.  When they miss school, their parent or guardian can be held responsible under our truancy laws.  If they are required to attend court proceedings, parents or guardians can be held to answer to the court if they fail to appear.  If they are discovered laboring in a sweatshop or wandering alone in traffic, authorities have someone to investigate.

On the other hand, UAC (in a new country, often with limited ability to speak the language) are simply given over by a federal contractor to a sponsor, based upon that sponsor asking for them.  When that sponsor is a parent, this does not necessarily implicate Florida's custody statutes; when it is not, however—and ***in about two-thirds of cases, this is the situation***-- Florida's laws most certainly have something to say.

ORR and its non-profit partners may wish for us to trust their process and ignore the evidence and testimony presented.  But what has been observed is the

---

[14] Indeed, the evidence we received was that many of these individuals scrupulously avoid the courts, authorities, and law enforcement altogether, fearing they will be deported as they are themselves awaiting court disposition of their claims.  For its part, ORR's policy manual proudly proclaims that it ***will not inquire about the citizenship of potential sponsors.  ORR can and does place UAC with a sponsor even if said sponsor has lost their asylum appeal and is subject to deportation at any time.***  The Senate Homeland Security and Governmental Affairs Committee held a hearing in April, 2019; at that time, it determined that for the ***six-month period*** between July 2018 and January 2019, **79%** of sponsors had no lawful status, and 21 of them were actually under final removal orders.

complete abdication of responsibility for the welfare of minor children they have transported to our state, then effectively abandoned, often to dangerous and illegal situations.

This could be construed as facilitating the trafficking of those children, or at a minimum, abandoning them to neglect. To quote **§787.06, Florida Statutes:**

> **(4)(a) Any … person having custody or control of a minor who … transfers custody or control of such minor, or offers to transfer custody of such minor, with knowledge _or in reckless disregard_ of the fact that, as a consequence of the sale or transfer, the minor will be subject to human trafficking commits a life felony[.]**

Our findings in this investigation echo what our legislature has previously found as well:

### §787.06. Human trafficking

(1)(a) The Legislature finds that human trafficking is a form of modern-day slavery. Victims of human trafficking are young children, teenagers, and adults. Thousands of victims are trafficked annually across international borders worldwide. Many of these victims are trafficked into this state. Victims of human trafficking also include citizens of the United States and those persons trafficked domestically within the borders of the United States. The Legislature finds that victims of human trafficking are subjected to force, fraud, or coercion for the purpose of sexual exploitation or forced labor.

(b) The Legislature finds that while many victims of human trafficking are forced to work in prostitution or the sexual entertainment industry, trafficking also occurs in forms of labor exploitation, such as domestic servitude, restaurant work, janitorial work, sweatshop factory work, and migrant agricultural work.

(c) The Legislature finds that traffickers use various techniques to instill fear in victims and to keep them enslaved. Some traffickers keep their victims under lock and key. However, the most frequently used practices are less obvious techniques that include isolating victims from the public and family members; confiscating passports, visas, or other identification documents; using or threatening to use violence toward victims or their families; telling victims that they will be imprisoned or deported for immigration violations if

they contact authorities; and controlling the victims' funds by holding the money ostensibly for safekeeping.

(d) It is the intent of the Legislature that the perpetrators of human trafficking be penalized for their illegal conduct and that the victims of trafficking be protected and assisted by this state and its agencies[.]

Moreover, according to **§827.03, Florida Statutes**:

(e) **"Neglect of a child"** means:

> 2. A caregiver's ***failure to make a reasonable effort*** to protect a child from abuse, neglect, or exploitation by another person.

> [N]eglect of a child may be based on repeated conduct or on a single incident or omission that results in, ***or could reasonably be expected to result in***, serious physical or mental injury, or a substantial risk of death, to a child.

The intentional avoidance of knowledge regarding the flaws in the process and their foreseeable outcomes does not absolve them of culpability. We find it helpful, in view of the details set forth above, to further remind our readers, including placement agencies, their employees, and donors, of Florida Standard Jury Instruction 3.3(h):

**"Willful Blindness."**

**In some cases, the issue to be determined is whether the defendant had knowledge of a certain fact. Florida law recognizes a concept known as willful blindness, which is sometimes referred to as "deliberate avoidance of positive knowledge." Willful blindness occurs when a person has his or her suspicion aroused about a particular fact, realized its probability, but deliberately refrained from obtaining confirmation because he or she wanted to remain in ignorance. A person who engages in willful blindness is deemed to have knowledge of that fact.**

## IX. Recommendations

Florida has a robust system for addressing custody of children, both temporary and permanent. When someone other than a child's natural parent is obtaining custody, they are required to comply with Chapter 63 (adoption) and/or Chapter 751 (Temporary Custody, including by Extended Family members). These statutes involve the courts and other professionals in the process, and ***there is no reason to require less legal protection for children born elsewhere.***

Floridians cannot exercise direct control over immigration policy, nor over ORR's treatment of UAC. However, Floridians most certainly can and should regulate those living among us who seek out the responsibility of raising a child not their own. For U.S. citizen children, we already do.

Nelson Mandela said, "The true character of a society is revealed in how it treats its children." Accordingly, we urge our leaders to do the following:

1) Mandate that any person residing (either temporarily or permanently) in this State, who obtains continuing physical custody of a minor child of whom the individual is not the biological parent or court-appointed legal guardian, including where that custody is conferred by an agency of any government, a Child Placement Agency as defined in Chapter 409.175, or any other company or organization, **must within thirty (30) days report that custody to the Department of Children and Families *and* initiate proceedings under Chapter 63 or Chapter 751 of the Florida Statutes to determine legal custody of the minor child**.

   ***Failure to do so should be a felony***, at least of the third degree, and could be easily incorporated as an additional section of Chapter 787.06 (Human Trafficking), 827.03 (Child Neglect), or as a standalone statute. DCF should be required to notify the Department of Law Enforcement upon becoming aware of such a situation. Repeat offenses on multiple occasions or involving multiple children should result in increased penalties. This statute should apply retroactively, to protect those children already here. These crimes should also be authorized for investigation by the Department of Law Enforcement and prosecution by the Office of Statewide Prosecution since bringing children into the state affects every circuit.

2) Any organization or individual licensed as a Child Placement Agency or facilitating the reunification of a child with a purported biological parent must document the relationship with either (a) original documentation of live birth naming the individual as a parent or (b) paternity/maternity testing established via a DNA test, and maintain such records in its possession.

We understand and appreciate that at current rates, this may add to the docket of civil cases statewide requiring a basic determination of UAC custody by Florida courts. We consider this a worthwhile use of resources, as it is everyone's duty to protect children, regardless of where they might be from.

Respectfully submitted to the Honorable Ellen S. Masters, Presiding Judge of the Twenty-First Statewide Grand Jury, this 29th day of March, 2023.

_____
Vice-Foreperson Juror #3
Twenty-First Statewide Grand Jury

THE FOREGOING Third Presentment was returned to me in open court this this 29th day of March, 2023.

_____
HON. ELLEN S. MASTERS,
Presiding Judge
Twenty-First Statewide Grand Jury

I, Nicholas B. Cox, Statewide Prosecutor and Legal Advisor, Twenty-First Statewide Grand Jury of Florida, hereby certify that I, as authorized and required by law, have advised the Grand Jury which returned this Report on this 29th day of March, 2023.

NICHOLAS B. COX
Statewide Prosecutor
Twenty-First Statewide Grand Jury

I, Guillermo Vallejo, Assistant Statewide Prosecutor and Assistant Legal Advisor, Twenty-First Statewide Grand Jury of Florida, hereby certify that I, as authorized and required by law, have advised the Grand Jury which returned this Report on this 29th day of March, 2023.

GUILLERMO VALLEJO
Assistant Statewide Prosecutor
Twenty-First Statewide Grand Jury

I, Richard Mantei, Assistant Statewide Prosecutor and Assistant Legal Advisor, Twenty-First Statewide Grand Jury of Florida, hereby certify that I, as authorized and required by law, have advised the Grand Jury which returned this Report on this 29th day of March, 2023.

RICHARD MANTEI
Assistant Statewide Prosecutor
Florida Bar #119296
Twenty-First Statewide Grand Jury

I, Robert Finkbeiner, Assistant Statewide Prosecutor and Assistant Legal Advisor, Twenty-First Statewide Grand Jury of Florida, hereby certify that I, as authorized and required by law, have advised the Grand Jury which returned this Report on this 29th day of March, 2023.

ROBERT FINKBEINER
Assistant Statewide Prosecutor
Twenty-First Statewide Grand Jury

FILED
JOHN A. TOMASINO
MAR 29 2023
CLERK, SUPREME COURT
BY_____

46